ROBERT R. MOORE (BAR NO. 113818)
MICHAEL S. GREGER (BAR NO. 156525)
WILLIAM W. HUCKINS (BAR NO. 201089)
MARLENE M. MOFFITT (BAR NO. 223658)
ALLEN MATKINS LECK GAMBLE
   MALLORY & NATSIS LLP
Three Embarcadero Center, 12th Floor
San Francisco, CA  94111-4074
Phone:  (415) 837-1515
Fax:  (415) 837-1516

Attorneys for Appellees and Cross-Appellants
Burlingame Capital Partners II, L.P. and Electrochem
Funding, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>QMECT, INC.,<br><br>        Debtor. | Case No. C-06-05401<br><br>(Consolidated with C-06-05402)<br><br>[On appeal from Chapter 7 Bankr. Case No. 04-41044  LT] |
| QMECT, INC.,<br><br>        Appellant,<br><br>    vs.<br><br>BURLINGAME CAPITAL PARTNERS II,<br>L.P. and ELECTROCHEM FUNDING, LLC,<br><br>        Appellees | APPELLEES' AND CROSS-APPELLANTS'<br>OPPOSING BRIEF ON APPEAL AND<br>OPENING BRIEF ON CROSS-APPEAL<br><br><br>APPELLEES' AND CROSS-APPELLANTS'<br>OPENING BRIEF ON APPEAL AND CROSS-<br>APPEAL |
| BURLINGAME CAPITAL PARTNERS II,<br>L.P. and ELECTROCHEM FUNDING, LLC,<br><br>        Cross-Appellants,<br><br>    vs.<br><br>QMECT, INC.,<br><br>        Cross-Appellee. | |

704126.05/SF

APPELLEES AND CROSS-APPELLANTS' BRIEF ON APPEAL AND CROSS-APPEAL

# TABLE OF CONTENTS

**Page**

BASIS OF APPELLATE JURISDICTION ............................................................................. 1

APPLICABLE STANDARD OF APPELLATE REVIEW ...................................................... 2

ISSUES PRESENTED ON APPEAL ..................................................................................... 3

ISSUES PRESENTED ON CROSS-APPEAL ....................................................................... 3

STATEMENT OF CASE ........................................................................................................ 4

A.    Nature of the Case ...................................................................................................... 4

B.    Course of Proceedings, Disposition in the Bankruptcy Court and Facts
Relevant to Issues Presented for Review ................................................................... 5

SUMMARY OF ARGUMENT ON APPEAL ...................................................................... 12

ARGUMENT ON APPEAL ................................................................................................. 14

I.    THE BANKRUPTCY COURT CORRECTLY FOUND THAT QMECT'S
POST-PETITION ASSETS, INCLUDING THE ADEQUATE
PROTECTION FUNDS AND DISPUTED CASH, WERE PROCEEDS OF
THE SECURED LENDERS' COLLATERAL UNDER THEIR BLANKET
LIENS ...................................................................................................................... 14

II.    THE BANKRUPTCY COURT CORRECTLY FOUND THAT THE
SECURED LENDERS' PROCEEDS SECURITY INTEREST COULD
INCREASE IN VALUE AFTER THE PETITION DATE ....................................... 23

III.    THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION IN
ENTERING THE FINAL ORDER AND GRANTING THE SECURED
LENDERS RELIEF FROM THE AUTOMATIC STAY .......................................... 27

SUMMARY OF ARGUMENT ON CROSS-APPEAL ........................................................ 27

ARGUMENT ON CROSS-APPEAL ................................................................................... 29

I.    THE BANKRUPTCY COURT SHOULD HAVE ALLOWED THE
SECURED LENDERS TO FORECLOSE ON THEIR REPLACEMENT
LIENS WITHOUT FIRST REQUIRING THEM TO ESTABLISH THAT
THEIR COLLATERAL HAD DIMINISHED IN VALUE DURING THE
BANKRUPTCY .......................................................................................................... 29

II.    THE BANKRUPTCY COURT SHOULD HAVE ALLOWED THE
SECURED LENDERS TO OBTAIN THE ADEQUATE PROTECTION
FUNDS WITHOUT REQUIRING THE SECURED LENDERS TO FIRST
to first ESTABLISH THAT THEIR COLLATERAL HAD DIMINISHED
IN VALUE DURING THE BANKRUPTCY OR THAT THE ADEQUATE
PROTECTION FUNDS WERE THE PROCEEDS OF THEIR
COLLATERAL ............................................................................................................ 32

CONCLUSION .................................................................................................................... 33

704126.05/SF    APPELLEES AND CROSS-APPELLANTS' BRIEF ON APPEAL AND CROSS-
APPEAL

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A&A Sign Co. v. Maughan*,
419 F.2d 1152 (9th Cir. 1969).................................................................................... 31

*Algeran, Inc. v. Advance Ross Corp.*,
759 F.2d 1421 (9th Cir. 1985)..................................................................................... 12

*Anderson v. Mouradick (In re Mouradick)*,
13 F.3d 326 (9th Cir. 1994)......................................................................................... 31

*Bank of West v. Commercial Credit Fin. Servs., Inc.*,
852 F.2d 1162 (9th Cir. 1988)........................................................................................ 2

*Benedor Corp. v. Conejo Enters. (In re Conejo Enters.)*,
96 F.3d 346 (9th Cir. 1996)............................................................................... 1, 2, 27

*Chrysler Credit Corp. v. Superior Court*,
17 Cal.App.4[th] 1303 (1993)......................................................................................... 16

*Dewsnup v. Timm*,
502 U.S. 410 (1992) ............................................................................... 14, 23, 25, 26

*Drehsen v. Bank of St. Petersburg (In re Drehsen)*,
190 B.R. 441 (D. M.D. Fla. 1995) ................................................................................ 19

*Feder. v. Lazar (In re Lazar)*,
83 F.3d 308 (9th Cir. 1996)..................................................................................... 2, 27

*Fifteenth RMA Partners, L.P. v. Pacific/West Communs. Group, Inc. (In re
Pacific/West Communs. Group Inc.)*,
301 F.3d 1150 (9th Cir. 2002)....................................................................................... 15

*Financial Sec. Assurance v. Days Cal. Riverside Ltd. P'ship (In re Days Cal.
Riverside Ltd. P'ship)*,
27 F.3d 374 (9th Cir. 1994)..................................................................................... 15, 19

*Gold Coast Asset Acquisition, L.P. v. 1441 Veteran Street Co. (In re 1441 Veteran
Street Co.)*,
144 F.3d 1288 (9th Cir. 1998), *cert. denied*, 525 U.S. 1142 (1999) ............... 14, 20, 23, 24

*In re Bumper Sales, Inc.*,
907 F.2d 1430 (4th Cir. 1990)................................................................... 16, 17, 19, 21

*In re El Paso Refinery, L.P.*,
171 F.3d 249 (5th Cir. 1999)........................................................................................ 23

*In re Flagler-At-First Assocs.*,
114 B.R. 297 (Bankr. S.D. Fla. 1990)........................................................................... 33

*In re Gibson Products of Arizona*,
543 F.2d 652 (9th Cir. 1976)......................................................................................... 16

APPELLEES AND CROSS-APPELLANTS' BRIEF ON APPEAL AND CROSS-
APPEAL

**Page(s)**

*In re Machinery, Inc.*,
        287 B.R. 755 (Bankr. E.D. Mo. 2002) ................................................................. 20, 25, 32

*In re Muma Servs.*,
        322 B.R. 541 (Bankr. D. Del. 2005) ........................................................................ 15, 26

*In re Northeastern Copy Servs., Inc.*,
        175 B.R. 580 (Bankr. E.D. Pa. 1994).......................................................................... 21, 22

*In re Onouli-Kona Land Co.*,
        846 F.2d 1170 (9th Cir. 1988).......................................................................................... 12

*In re Package Design & Supply Co.*,
        217 B.R. 422 (Bankr. W.D.N.Y. 1998)......................................................................... 17, 19

*In re Reddington/Sunarrow Ltd. P'ship*,
        119 B.R. 809 (Bankr. D. N.M. 1990)............................................................................. 25, 26

*In re Sherwood Ford, Inc.*,
        125 B.R. 957 (Bankr. D. Md. 1991).............................................................................. 18, 19

*In re Skagit Pacific Corp.*,
        316 B.R. 330 (9th Cir. B.A.P. 2004) ...................................................... 10, 20, 21, 30

*In re Tower Air, Inc.*,
        397 F.3d 191 (3rd Cir. 2005)................................................................................ 15, 25, 26

*In re Veeco Inv. Co. L.P.*,
        170 B.R. 149 (Bankr. E.D. Mo. 1994) ............................................................................... 25

*In re Wabash Valley Power Ass'n*,
        72 F.3d 1305 (7th Cir. 1996), *cert. denied*, 519 U.S. 965 (1996) ..................................... 22

*In re Wallman*,
        71 B.R. 125 (Bankr. D.S.D. 1987) ..................................................................................... 21

*In re Waste Conversion Tech., Inc.*,
        205 B.R. 1004 (D. Conn. 1997) ................................................................................. 29, 30

*Indep. Towers of Wash. v. Washington*,
        350 F.3d 925 (9th Cir. 2003)................................................................................................. 3

*J. Catton Farms, Inc. v. First Nat'l Bank*,
        779 F.2d 1242 (7th Cir. 1985)............................................................................................. 15

*Kohler v. Inter-Tel Techs.*
        244 F.3d 1167 (9th Cir. 2001) ............................................................................................... 3

*Moldo v. Matsco, Inc. (In re Cybernetic Servs.)*,
        252 F.3d 1039 (9th Cir. 2001)............................................................................................... 2

*Searles v. Riley (In re Searles)*,
        317 B.R. 368 (9th Cir. B.A.P. 2004)..................................................................................... 3

**Page(s)**

*Sloan v. Zions First Nat'l Bank, N.A. (In re Castletons, Inc.),*
    990 F.2d 551 (10th Cir. 1993) .......................................................................................... 23

*Small v. Beverly Bank,*
    936 F.2d 945 (7th Cir. 1991) ...................................................................................... 29, 30

*Smith v. Dairymen, Inc.,*
    790 F.2d 1107 (4th Cir. 1986) ......................................................................................... 15

*United States v. United States Gypsum Co.,*
    333 U.S. 364, 395 (1948) ................................................................................................... 2

*Watson Pacific Ventures v. Valley Fed. Sav. & Loan (In re Safeguard Self-Storage Trust),*
    2 F.3d 967 (9th Cir. 1993) ............................................................................................... 31

**Statutes**

11 U.S.C. § 101 (36) ............................................................................................................... 29

11 U.S.C. § 362 ........................................................................................................................ 4

11 U.S.C. § 362(d) ................................................................................................... 4, 8, 27, 32

11 U.S.C. § 363(a) .................................................................................................................. 13

11 U.S.C. § 363(e) .................................................................................................................. 29

11 U.S.C. § 506(a) .................................................................................................................. 23

11 U.S.C. § 547(c)(5) ............................................................................................................. 22

11 U.S.C. § 552(a) ................................................................................................ 17, 20, 22, 30

11 U.S.C. § 552(b) ............................................................................................................ passim

28 U.S.C. § 158(a) .................................................................................................................... 1

28 U.S.C. § 158(c)(1) ............................................................................................................... 2

Cal. Comm. Code § 9102(12) ................................................................................................. 21

Cal. Comm. Code § 9102(12)(A) ........................................................................................... 16

Cal. Comm. Code § 9102(64) ............................................................................................ 15, 21

Cal. Comm. Code § 9203(f) .................................................................................................... 15

Cal. Comm. Code § 9701 ........................................................................................................ 15

Cal. Comm. Code. § 9315(a)(2) .............................................................................................. 16

Fed. R. Bankr. P. 8002 ............................................................................................................ 31

(iv)

704126.05/SF    APPELLEES AND CROSS-APPELLANTS' BRIEF ON APPEAL AND CROSS-APPEAL

**Page(s)**

Fed. R. Bankr. P. 8013 ..................................................................................................... 2, 19

Fed. R. Bankr. P. 9023 ........................................................................................................... 31

Fed. R. Bankr. P. 9024 ..................................................................................................... 31, 33

**Other Authorities**

Norton, *Norton Bankruptcy Law and Practice*,
    § 87.22 (2nd Ed. 2006) .................................................................................................... 30

704126.05/SF    APPELLEES AND CROSS-APPELLANTS' BRIEF ON APPEAL AND CROSS-APPEAL

Appellees and Cross-Appellants Burlingame Capital Partners II, L.P. ("Burlingame") and Electrochem Funding, LLC ("Electrochem Funding," and together with Burlingame, "Secured Lenders") submit this Opposing Brief on Appeal and Opening Brief on Cross-Appeal from the Final Order Granting [the Secured Lenders] Relief from the Automatic Stay ("Final Order"), entered by the United States Bankruptcy Court for the Northern District of California on July 14, 2006.  Following entry of the Final Order, the bankruptcy court issued a limited stay pending appeal preventing the Secured Lenders from foreclosing on certain monies held in trust (referred to as the Adequate Protection Funds) and requiring the Secured Lenders to deposit certain additional cash (referred to as the Disputed Cash) if the Secured Lenders transferred the real property foreclosed upon following entry of the Final Order.  The Adequate Protection Funds and Disputed Cash are the only assets affected by this appeal from the Final Order.  Secured Lenders urge this Court to affirm the Final Order, either on the bases set forth in the bankruptcy court's memoranda of decision underlying the Final Order, or for the reasons set forth on the cross-appeal.

<strong><span style="color:red">BASIS OF APPELLATE JURISDICTION</span></strong>

The district courts of the United States have jurisdiction to hear appeals from "final judgments, orders and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title."  28 U.S.C. § 158(a).

"The decision of a bankruptcy court granting or denying relief from an automatic stay under section 362(d) is a final decision reviewable by this court." *Benedor Corp. v. Conejo Enters. (In re Conejo Enters.)*, 96 F.3d 346, 351 (9th Cir. 1996).

On July 14, 2006, the bankruptcy court entered its Final Order.  (App. 106-110.)[1]

On July 21, 2006, QMECT, Inc. ("QMECT") filed its Notice of Appeal from the Final Order.  (App. 111-119.)

On July 31, 2006, the Secured Lenders filed their Notice of Cross-Appeal from the Final Order.  (App. 120-121.)

On July 31, 2006, the Secured Lenders filed their Notice of Election to Have Appeal and

---

[1]  All citations to "App." refer to the Secured Lenders' Appendix (Excerpts of the Record) accompanying this Brief, with citations to the page and line numbers, where appropriate.

-1-

704126.05/SF

APPELLEES AND CROSS-APPELLANTS' BRIEF ON APPEAL AND CROSS-APPEAL

Cross-Appeal Heard by United States District Court under 28 U.S.C. § 158(c)(1).  (App. 122.)

On August 3, 2006, the bankruptcy court entered its Order re Motion for Stay Pending Appeal, allowing the Secured Lenders to foreclose on their collateral, except the Adequate Protection Funds (amounting to $345,885.31), and requiring the Secured Lenders to deposit the Disputed Cash (amounting to $392,902) with the Adequate Protection Funds if the property foreclosed upon was subsequently transferred.  (App. 123-126.)

### APPLICABLE STANDARD OF APPELLATE REVIEW

"The decision to grant or deny relief from the automatic stay is committed to the sound discretion of the bankruptcy court, and we review such decision under the abuse of discretion standard."  *In re Conejo Enters.,* 96 F.3d at 351; *see also Moldo v. Matsco, Inc. (In re Cybernetic Servs.*), 252 F.3d 1039, 1045 (9th Cir. 2001).[2]  "Decisions committed to the bankruptcy court's discretion will be reversed only if based on an erroneous conclusion of law or when the record contains no evidence on which the bankruptcy court rationally could have based that decision."  *In re Conejo Enters.*, 96 F.3d at 351.

A bankruptcy court's findings of fact are reviewed under the clearly erroneous standard and its conclusions of law are reviewed de novo.  *In re Lazar*, 83 F.3d at 308; *see also* Fed. R. Bankr. P. 8013 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous. . . .").  A factual finding is clearly erroneous if, when based on all the evidence, the reviewing court is left with the definite and firm conviction that a mistake has been committed.  *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

If a mixed question of law and fact is presented, the bankruptcy court's determinations of historical facts are reviewed for clear error, and its selection of applicable legal rules and the application of the facts to those rules are reviewed de novo.  *See Bank of West v. Commercial Credit Fin. Servs., Inc.*, 852 F.2d 1162, 1164 (9th Cir. 1988)("The district court's choice and application of the appropriate commercial code provision in the present case to resolve the priority dispute involves legal questions subject to our de novo review.  But the district court does not

---

[2] The standard of review on appeal of the bankruptcy court's findings is the same for the district court and the circuit court of appeals.  *See Feder. v. Lazar (In re Lazar)*, 83 F.3d 306, 308 (9th Cir. 1996).

704126.05/SF    APPELLEES AND CROSS-APPELLANTS' BRIEF ON APPEAL AND CROSS-APPEAL

apply the commercial code in a vacuum; it first must determine the facts surrounding the controversy.  We review these findings of fact for clear error. . . .  Once we are satisfied that the historical facts have been established without clear error, the choice of the applicable rule of law to resolve the dispute and its application to the facts present issues of law subject to de novo review.")(internal citations omitted); *Searles v. Riley (In re Searles)*, 317 B.R. 368, 373 (9th Cir. B.A.P. 2004).

## ISSUES PRESENTED ON APPEAL

1.      Whether the bankruptcy court abused its discretion in entering the Final Order and granting the Secured Lenders relief from the automatic stay foreclose on their collateral?

2.      Whether the bankruptcy court's factual findings were clearly erroneous that QMECT's post-petition assets (including the Disputed Cash and Adequate Protection Funds at issue in this appeal) were generated from QMECT's use of the Secured Lenders' collateral?

3.      Having found that QMECT's post-petition assets were generated from QMECT's use of the Secured Lenders' collateral, whether the bankruptcy court misapplied the law in concluding that the Secured Lenders' liens and security interests extended to the Disputed Cash and Adequate Protection Funds as proceeds of their collateral?

4.      Whether the bankruptcy court erred in concluding that, upon granting relief from the automatic stay, the Secured Lenders were entitled to foreclose on the proceeds of their collateral which accumulated during QMECT's failed reorganization attempt?

Secured Lenders note that while QMECT's opening brief frames five issues on appeal, it appears that several of the issues have been waived or abandoned, as no argument was made supporting the issues in QMECT's opening brief.  *See Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1182 (9th Cir. 2001); *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929-30 (9th Cir. 2003).

## ISSUES PRESENTED ON CROSS-APPEAL

1.      Whether the bankruptcy court should have allowed the Secured Lenders to enforce the replacement liens granted to the Secured Lenders during the case for QMECT's use of the Secured Lenders' cash collateral without first requiring the Secured Lenders to present evidence establishing a diminution in value of their collateral during the case when neither the cash

-3-

704126.05/SF                    APPELLEES AND CROSS-APPELLANTS' BRIEF ON APPEAL AND CROSS-APPEAL

collateral orders, nor the replacement liens so provided?

2.    Whether the bankruptcy court should have allowed the Secured Lenders to obtain the Adequate Protection Funds, which were ordered to be paid by QMECT to the Secured Lenders' attorneys for the benefit of the Secured Lenders, without first requiring the Secured Lenders to (a) present evidence establishing a diminution in the value of their collateral during the case, or (b) trace the Adequate Protection Funds to proceeds of their collateral, as they did?

<span style="color:red"><strong>STATEMENT OF CASE</strong></span>

<span style="color:red"><strong>A.    Nature of the Case</strong></span>

QMECT appealed from the Final Order granting the Secured Lenders relief from the automatic stay imposed by 11 U.S.C. § 362 and permitting the Secured Lenders to foreclose on their collateral, which constituted substantially all of QMECT's assets.  QMECT did not oppose granting the Secured Lenders relief from the automatic stay.[3]  Instead, QMECT argued that the Secured Lenders' blanket liens and security interests did not extend to the Adequate Protection Funds and Disputed Cash that had accumulated during QMECT's failed reorganization attempt despite the fact that the assets were generated by QMECT's use of the Secured Lenders' collateral.  Thus, QMECT opposed granting the Secured Lenders relief to foreclose on the Adequate Protection Funds and Disputed Cash because QMECT claimed that the assets were not the Secured Lenders' collateral.

After extensive briefing, evidentiary submissions and evidentiary hearings, the bankruptcy court determined that the Secured Lenders' prepetition blanket liens and security interests extended to the Adequate Protection Funds and QMECT's accumulated cash as proceeds of the Secured Lenders' prepetition collateral pursuant to Bankruptcy Code section 552(b).  In making that determination, the bankruptcy court found that the Secured Lenders had proved, by tracing under applicable nonbankruptcy law, that QMECT's post-petition assets (including the Adequate Protection Funds and Disputed Cash) were proceeds of the Secured Lenders' prepetition collateral.

---

[3]    There was no dispute that the legal standard for granting the Secured Lenders relief from the automatic stay under 11 U.S.C. § 362(d) had been met (i.e., that cause existed, including a lack of adequate protection, that QMECT had no equity in the subject property, and that the property was not necessary to an effective reorganization).  *See* 11 U.S.C. § 362(d).

-4-

704126.05/SF

APPELLEES AND CROSS-APPELLANTS' BRIEF ON APPEAL AND CROSS-APPEAL

Accordingly, the bankruptcy court granted the Secured Lenders' relief from the automatic stay to foreclose on their collateral, including the Adequate Protection Funds and Disputed Cash.

The bankruptcy court did not clearly err in finding that the assets QMECT accumulated during its failed reorganization attempt were properly traced as proceeds of the Secured Lenders' collateral. Nor did the bankruptcy err in applying Bankruptcy Code section 552(b) and finding that the Secured Lenders' prepetition security interests extended to the Adequate Protection Funds and Disputed Cash under applicable nonbankruptcy law. As such, the bankruptcy court did not abuse its discretion in granting the Secured Lenders' relief from the automatic stay to foreclose on their collateral, including the Adequate Protection Funds and Disputed Cash.

While the bankruptcy court did not err in entering the Final Order granting the Secured Lenders relief from the automatic stay, the Secured Lenders maintain, in the alternative, that the replacement liens they were granted under the orders allowing QMECT to use the Secured Lenders' cash collateral during the case covered all of QMECT's assets, and the Secured Lenders' should have been able to foreclose on their replacement liens without having to show a diminution in value of their collateral during the case, as the bankruptcy court found. Likewise, the Secured Lenders maintain that the bankruptcy court's cash collateral orders required QMECT to make payments to the Secured Lenders for using their cash collateral (representing the Adequate Protection Funds), and the Secured Lenders were entitled to obtain such funds without proving diminution in the value of their collateral or tracing the funds as proceeds of their collateral. The cash collateral orders did not impose those conditions before the Secured Lenders could foreclose on the replacement liens or before they were entitled to the Adequate Protection Funds.

**B.      Course of Proceedings, Disposition in the Bankruptcy Court and Facts Relevant to Issues Presented for Review**

QMECT filed its voluntary petition under chapter 11 of the Bankruptcy Code on February 27, 2004. (App. 91:11-12.)

As of the petition date, QMECT had four outstanding loans payable to Electrochem Funding, with principal and interest owed, as follows:

1.      Variable Rate Installment Note ("Variable Rate Installment Note"): outstanding principal of $187,500 and prepetition interest of $1,696.31;

-5-

2.    Note Secured By Deed of Trust ("DOT Note"): outstanding principal of $537,816.96 and prepetition interest of $5,052.51;

3.    Amended and Restated Note Secured By Deed of Trust ("Additional DOT Note"): outstanding principal of $894,737.22 and prepetition interest of $8,948.32; and

4.    Master Revolving Note ("Revolving Note"): outstanding principal of $900,000 and prepetition interest of $7,850.60.[4]

The total outstanding principal and interest on the four loans as of the petition date was $2,520,054.78 and $23,547.74, respectively.  (App.  36:18-37:17.)

The Variable Rate Installment Note and Revolving Note were secured by senior priority liens on all of the Debtor's personal property except for:  (i) certain leased equipment if the leases were "true leases" (although the bankruptcy court determined that Electrochem Funding nevertheless had a lien on the lease contract rights); (ii) prepetition deposit accounts (unless the cash on deposit represented proceeds of Electrochem Funding's collateral); and (iii) grid flooring and certain other fixtures in which Electrochem Funding's lien was junior to another creditor. (App.  37:1-15.)  The DOT Note and Additional DOT Note were secured by senior priority liens on QMECT's real property and fixtures located at the company's facility at 32500 Central Avenue, Union City, California, 94587, and all of the rents, issues and profits generated thereby.  (*Id.*)

QMECT also had an outstanding loan payable to Burlingame, with a principal balance of $2,000,000, prepetition interest of $1,043,635.01, and prepetition collection costs of $357,998.59, owing as of the petition date.  In total, QMECT owed $3,401,633.60 on the Burlingame loan as of the petition date.  The Burlingame loan was secured by a junior priority lien on all of the collateral securing the Electrochem Funding loans and a first priority lien on QMECT's remaining property, except for prepetition deposit accounts (unless the cash on deposit represented proceeds of Burlingame's collateral).  (App.  37:19-38:4.)

On March 1, 2004, the first business day following the petition date, QMECT filed an emergency motion for authority to obtain a post-petition loan ("Post-Petition Loan") from Brian Fitzpatrick ("Fitzpatrick"), which the bankruptcy court granted.  (App. 91:12-92:20.)  Fitzpatrick advanced approximately $150,000 under the Post-Petition Loan.  "In fact, Fitzpatrick had already

---

4    Electrochem Funding is the successor in interest of the loans from Comerica Bank to QMECT.

-6-

APPELLEES AND CROSS-APPELLANTS' BRIEF ON APPEAL AND CROSS-APPEAL

advanced approximately $50,000 of the proposed loan by making payments directly to various pre-petition creditors of QMECT" at the time the emergency motion was filed. (App. 91:16-18.) The remaining $100,000 of the Post-Petition Loan was advanced to QMECT on March 3, 2004, which the bankruptcy court found also went to pay QMECT's prepetition obligations. (App. 92:7-20, 103:20-24.)

On March 1, 2004, QMECT also filed a motion to use the Secured Lenders' cash collateral, which the bankruptcy court granted. (App. 91:11-92:6.) Under the order granting QMECT use of the cash collateral, the Secured Lenders were granted replacement liens as adequate protection of their interests:

> "a.      . . . a replacement lien (the "Adequate Protection Liens") on and in the types of assets identified in the prepetition loan documents executed by [QMECT] in favor of [Burlingame] and [Electrochem Funding] or their predecessors in interest (the "Adequate Protection Collateral") . . . .  The Adequate Protection Liens shall be fully perfected, first priority liens as to the parties other than [the Secured Lenders] without the necessity of further action by or on behalf of [the Secured Lenders]; shall have the same priority as existed prior to the commencement date of [QMECT's] chapter 11 case; *and shall attach to all Adequate Protection Collateral whether now owned or hereafter acquired.*
>
> b.      The Adequate Protection Collateral shall also include [QMECT's] right, title and interest in cash and deposit and investment accounts including proceeds of borrowings made by [QMECT] in this Chapter 11 case." (App.  2:18-3:11 (emphasis added).)

Additional orders authorizing QMECT's continued use of the Secured Lenders' cash collateral were entered throughout the case, which provided the same replacement liens, but also required QMECT to make certain payments to the Secured Lenders' attorneys for the benefit of the Secured Lenders (i.e., Adequate Protection Funds), as further adequate protection of the Secured Lenders' interests. (*See, e.g.,* App.  8:10-9:3, 11:14-21,  26:3-26, 29:13-19.)

On December 19, 2005, a contested evidentiary hearing was held on QMECT's continued use of cash collateral, following which the bankruptcy court issued its Memorandum of Decision re Cash Collateral Motion.  In the Memorandum of Decision, the bankruptcy court found that the Secured Lenders together held a blanket lien on all of QMECT's assets. (App.  17:18-19:9.)  The bankruptcy court also found, by "completely persuasive" expert testimony, that the value of QMECT's business (i.e., the Secured Lenders' collateral) had decreased by over one million

dollars since QMECT filed for bankruptcy in February 2004.  (App. 17:8-17.)[5]

On March 8, 2006, the Secured Lenders filed their Third Motion [] for Relief from the Automatic Stay, Including Relief to Foreclose Upon Debtor's Cash, Deposit Accounts and Adequate Protection Payment Funds ("Relief from Stay Motion").  In the Relief from Stay Motion, the Secured Lenders argued that, under 11 U.S.C. § 362(d): (1) cause existed to grant relief from the automatic stay because there had been a significant diminution in value of the Secured Lenders' collateral during the bankruptcy resulting in a failure of adequate protection of the Secured Lenders' interests; and (2) QMECT had no equity in the property and it was not necessary to an effective reorganization.  (App.  41:5-45:3.)

A preliminary hearing on the Relief from Stay Motion was conducted on March 16, 2006, at which QMECT conceded that the Secured Lenders were entitled to relief from the automatic stay to foreclose on their collateral in existence at the time the bankruptcy was filed, i.e., QMECT's real property and fixed assets, as well as QMECT's inventory, regardless of whether it existed at the petition date or was generated post-petition.  (App.  48:16-26.)  QMECT did object, however, to granting the Secured Lenders relief from the automatic stay to foreclose on QMECT's cash assets generated and accumulated after the petition date.  (App.  48:26-49:2.)  On March 24, 2006, the bankruptcy court entered its Amended Order Granting Partial Relief from the Automatic Stay After Preliminary Hearing, which granted the Secured Lenders relief from the automatic stay to foreclose their security interests on all of QMECT's assets in existence at the time the bankruptcy was filed (i.e., QMECT's real property and fixed assets), and QMECT's inventory, regardless of when generated.  (App.  49:12-16.)  The Secured Lenders were not, at the preliminary hearing, granted relief from the automatic stay to foreclose on any assets acquired or generated by QMECT after the petition date (other than inventory), including cash, deposit accounts, security deposits, and the Adequate Protection Funds.  (App.  49:16-21.)

A final evidentiary hearing on the Secured Lenders' Relief from Stay Motion and right to foreclose on QMECT's remaining assets was scheduled for May 24, 2006.  (App.  54:16-19.)

---

[5]  As such, while QMECT argues in the opening brief that the Secured Lenders would realize a windfall if the Final Order is upheld, the value of the Secured Lenders' collateral actually diminished by over $1 million during the case.  (Opening Brief at p. 6:3-5.)

704126.05/SF        APPELLEES AND CROSS-APPELLANTS' BRIEF ON APPEAL AND CROSS-APPEAL

In advance of the final hearing, the Secured Lenders filed a trial brief in support of the Relief from Stay Motion. In the trial brief, the Secured Lenders argued that because they held blanket liens on all of QMECT's assets, as the bankruptcy court had previously determined, the remaining assets and Adequate Protection Funds were necessarily proceeds of the Secured Lenders' collateral under 11 U.S.C. § 552(b) and applicable nonbankruptcy law. Additionally, the Secured Lenders argued that: (1) after a failed reorganization attempt in bankruptcy, a debtor is not allowed to "strip down" the secured lenders' collateral and thus the Secured Lenders were legally entitled to any assets which may have accumulated during the failed reorganization attempt; and (2) the replacement liens granted to the Secured Lenders in the case extended to the remaining assets and Adequate Protection Funds. As such, the Secured Lenders claimed the remaining assets and Adequate Protection Funds were the Secured Lenders' collateral and they were entitled to relief from the automatic stay on the assets.

QMECT also filed a trial brief opposing relief from the automatic stay as to the remaining assets and Adequate Protection Funds.

On May 19, 2006, before the scheduled evidentiary hearing, the bankruptcy court issued its Memorandum re Issues Raised in Trial Brief. (App. 54-59.) The bankruptcy court stated it was inclined to agree with the Secured Lenders' position that because of their blanket liens, all of QMECT's post-petition assets, including the remaining assets and Adequate Protection Funds, were proceeds of the Secured Lenders' collateral regardless of whether the post-petition collateral increased after the petition date.[6] (App. 54:25-55:15.) As such, the bankruptcy court questioned the need to hold an evidentiary hearing on valuation. (*Id.*) QMECT, however, had not addressed the proceeds argument in its trial brief. (*Id.*) Thus, further briefing was ordered was ordered to allow QMECT to address the proceeds issue.[7]

---

[6] In the Memorandum, the bankruptcy court reiterated its prior conclusion that the Secured Lenders held a blanket lien on all of QMECT's assets because they were affiliates and could cooperate in foreclosing on their collateral, and any alleged defects in one of their liens could be remedied by the other's properly perfected security interest. QMECT did not challenge the bankruptcy court's conclusion, nor does it challenge that conclusion on appeal.

[7] As QMECT pointed out in its opening brief, an evidentiary hearing was held on the usury issue on May 24, 2006, followed by further briefing on that matter. After hearing the evidence and considering the further briefing, the bankruptcy court concluded that the loans were exempt from the usury laws. In rejecting the usury challenge, the bankruptcy court also

-9-

In its brief on the proceeds issue, QMECT argued that all the assets it acquired post-petition were not proceeds of Secured Lenders' collateral under the blanket liens because QMECT borrowed approximately $150,000 under the Post-Petition Loan, which was deposited in QMECT's bank account and commingled with other cash on hand.  (App.  65:20-66:3, 74:1-3.)  As such, QMECT argued that the Secured Lenders were only entitled to QMECT's post-petition assets if they could trace the assets as proceeds of their pre-petition collateral.  (App.  76:1-3.)

The Secured Lenders filed a reply brief on the proceeds issue.

On June 2, 2006, the bankruptcy court issued its Memorandum of Decision re Proceeds Issue.  (App. 80-89.)  In the Memorandum, the bankruptcy court stated

> The Court has previously concluded that, between them, at the time the bankruptcy case was filed, the [Secured] Lenders held a "blanket lien" on all of Qmect's pre-petition assets with the exception of two or three trucks used in the operation of the business . . . .  Based on the Court's findings and conclusions, as set forth in other memoranda, it is clear that, at the time the chapter 11 case was filed, the value of the [Secured] Lender's collateral was less than the combined amount of their claims.  Moreover, it does not appear to be disputed that the [Secured] Lenders' security interests, by their terms, extend to the proceeds of the [Secured] Lenders' collateral.

> Based on the foregoing, the [Secured] Lenders contend that all of the accounts receivable generated by Qmect post-petition and the funds collected from those accounts receivable are the proceeds of their pre-petition collateral.  As a result, they contend it is unnecessary to value their collateral at the time of the filing and would be improper to limit their interest in the funds on hand now to that value.  (App.  82:12-83:3.)[8]

Citing *In re Skagit Pacific Corp.*, 316 B.R. 330 (9th Cir. B.A.P. 2004), the bankruptcy court stated that a secured creditor could claim proceeds of post-petition accounts receivable if it could properly trace the proceeds to its pre-petition collateral, even if the proceeds of the pre-petition collateral were commingled with funds from another source.  (App.  87:3-19.)  Tracing is typically done using the lowest intermediate balance rule.  (*Id.*)  The bankruptcy court then adopted the approach set forth in *Skagit Pacific* and required the Secured Lenders to trace the proceeds

---

concluded that the Secured Lenders were undersecured (i.e., the total value of their collateral was less than the amount of their claims).  (App.  81:3-12.)  QMECT does not challenge the bankruptcy court's ruling on the usury issue, or the resulting conclusion that the Secured Lenders were undersecured.  (*See* Opening Brief, at p. 5:4-6, 6:15-17.)

[8] The bankruptcy court later found that any lack of a security interest in the trucks (which was of insignificant market value) did not diminish the Secured Lenders' right to claim the post-petition assets as their proceeds.

generated by QMECT post-petition to the Secured Lenders' pre-petition collateral and not the Post-Petition Loan using the lowest intermediate balance rule. (App. 87:20-88:4.)

> Based on the applicable authorities, the Court concluded that, if the Post-Petition Assets [i.e., the post-petition accounts receivable, inventory, and cash] had been acquired or generated solely through the use of the [Secured] Lenders' pre-petition collateral, pursuant to 11 U.S.C. § 552(b), the [Secured] Lenders were entitled to claim the Post-Petition Assets as their collateral as well as the proceeds of their pre-petition collateral. However, if their pre-petition cash collateral had been commingled with funds not subject to their security interest, they would be required to trace their funds into the Post-Petition Assets, using the lowest intermediate balance methodology, to establish their right to claim some or all of the Post-Post-Petition Assets as their collateral. (App. 90:21-91:4.)

The Secured Lenders filed their memorandum responding to the bankruptcy court's Memorandum of Decision re Proceeds Issue, in which they specifically traced, with supporting declarations and documentary evidence, all of the remaining assets and Adequate Protection Funds to proceeds of their pre-petition collateral.

QMECT filed a responding brief, which notably failed to dispute any of the tracing evidence submitted by the Secured Lenders.

The Secured Lenders thereafter filed a reply memorandum, and the bankruptcy court took the matter under submission.

On June 26, 2006, the bankruptcy court issued its Second Memorandum of Decision re Proceeds Issue. (App. 90-105.) In the Second Memorandum, based on the Secured Lenders' evidence, the bankruptcy court found that the proceeds of the Post-Petition Loan were used by QMECT to pay pre-petition obligations. (App. 91:12-19, 92:7-21, 103:20-24.) QMECT does not challenge the bankruptcy court's factual findings on tracing (i.e., that all of the proceeds of the Post-Petition Loan were used to pay pre-petition obligations). (*See* Opening Brief, at p. 7:5-7.)[9] As no funds other than the proceeds of the Secured Lenders' collateral were used to generate QMECT's post-petition assets, the bankruptcy court concluded that all of the remaining assets and Adequate Protection Funds were proceeds of the Secured Lenders' pre-petition collateral.

---

[9] The bankruptcy court also concluded (as it had found in connection with the preliminary hearing in March 2006 and in its June 2, 2006 Memorandum) that the balance in QMECT's bank account into which the Pre-Petition Loan funds were deposited were proceeds of the Secured Lenders' prepetition collateral, (App. 100:2-5.) QMECT did not challenge the bankruptcy court's conclusion, nor is there any evidence to the contrary. (App. 100, n.5.)

-11-

Furthermore, the bankruptcy court found that the Secured Lenders' proceeds security interest could increase in value during the bankruptcy.  Based upon these factual findings and legal conclusions, the bankruptcy court granted the Secured Lenders relief from the automatic stay to foreclose on the remaining assets and Adequate Protection Funds in their entirety.  (App.  103:24-26.)

On July 14, 2006, the Court entered its Final Order, granting the Secured Lenders relief from the automatic stay to foreclose on their collateral.  (App. 106-110.)

Following entry of the Final Order, QMECT moved the bankruptcy court for a stay pending appeal.  On August 3, 2006, the bankruptcy court entered its Order on Motion for Stay Pending Appeal.  (App. 123-126.)  Other than staying the Secured Lenders' rights to foreclose on the Adequate Protection Funds (amounting to $345,885.31) and requiring the Secured Lenders to deposit $392,902 with the Adequate Protection Funds if the real property foreclosed upon was subsequently transferred (i.e., the Disputed Cash), the Final Order was immediately enforceable in all respects in accordance with applicable federal and state law.  (App.  124:5-28.)

On August 10, 2006, a nonjudicial foreclosure of the Secured Lenders' collateral was conducted, at which Burlingame acquired the subject assets by credit bid.[10]

### SUMMARY OF ARGUMENT ON APPEAL

The bankruptcy court properly held that the Secured Lenders were entitled to foreclose on their collateral, including the Disputed Cash and Adequate Protection Funds.  There was no dispute that the Secured Lenders satisfied the requirements for relief from the automatic stay under 11 U.S.C. § 362(d); the only question was the extent of the Secured Lenders' collateral that could be foreclosed upon.  The bankruptcy court relied on Bankruptcy Code section 552(b) in finding that the Secured Lenders' collateral included the Disputed Cash and Adequate Protection Funds.

Under Bankruptcy Code section 552(b), when a secured creditor is granted a security interest by the debtor before bankruptcy, and the security interest encumbers both collateral and the proceeds of that collateral, then the security interest automatically extends to proceeds

---

[10]    As QMECT only obtained a stay with respect to the Adequate Protection Funds and Disputed Cash, following the foreclosure sale, this Court's appellate jurisdiction over the Final Order is limited to the Secured Lenders' rights in those two assets. *See In re Onouli-Kona Land Co.*, 846 F.2d 1170, 1171-72 (9th Cir. 1988); *Algeran, Inc. v. Advance Ross Corp.*, 759 F.2d 1421, 1423 (9th Cir. 1985).

acquired by the debtor after bankruptcy to the extent provided by the security agreement between the parties and applicable nonbankruptcy law.  Under California law, proceeds of collateral includes everything that is acquired upon the sale or other disposition of the collateral, whatever is collected on account of the collateral, and all rights arising out of the collateral.  Proceeds includes proceeds of proceeds of collateral (i.e., second, third, fourth generations), and proceeds automatically become part of the collateral.  Furthermore, numerous courts analyzing the issue before this Court have held that when a secured creditor holds a blanket lien on a debtor's assets, and no funds other than the secured creditor's collateral were used to finance the debtor's post-petition operations or to generate the debtor's post-petition assets, then the debtor's post-petition assets are proceeds of the secured creditor's prepetition collateral.

Here, there is no dispute that the Secured Lenders held blanket security interests in virtually all of QMECT's assets, the security interests extended to proceeds of the Secured Lenders' collateral, and the value of the Secured Lenders' collateral was less than the outstanding debt (i.e., there were no excess assets represented by the collateral).  Furthermore, the bankruptcy court found, based upon the Secured Lenders' uncontroverted evidence, that QMECT's post-petition operations and the post-petition assets generated thereby were financed exclusively with the Secured Lenders' cash collateral.[11]  The bankruptcy court also found that the Secured Lenders had traced their prepetition collateral to QMECT's post-petition assets under applicable nonbankruptcy law.  As such, the bankruptcy court did not err by holding that the Disputed Cash and Adequate Protection Funds were the Secured Lenders' collateral under Bankruptcy Code section 552(b), which the Secured Lenders were entitled to foreclose upon.

The bankruptcy court also properly held that the value of the Secured Lenders' collateral could increase during the bankruptcy, and if it did, the Secured Lenders were entitled to the appreciation.  The bankruptcy court found the Ninth Circuit's decision in *Gold Coast Asset Acquisition, L.P. v. 1441 Veteran Street Co. (In re 1441 Veteran Street Co.)*, 144 F.3d 1288 (9th

---

[11]    Cash collateral is defined in 11 U.S.C. § 363(a), and includes cash, deposit accounts, cash equivalents and proceeds subject to a secured creditor's security interest as provided in Bankruptcy Code section 552(b), whether existing before or after the commencement of the bankruptcy case.  11 U.S.C. § 363(a).

-13-

Cir. 1998), *cert. denied*, 525 U.S. 1142 (1999), to be controlling on the issue (and persuasive as well). *1441 Veteran Street*, which relied heavily on the Supreme Court's decision in *Dewsnup v. Timm*, 502 U.S. 410 (1992), held that any appreciation in value of a secured creditor's collateral resulting from an accumulation of proceeds during a bankruptcy case inures to the benefit of the secured creditor pursuant to the secured creditor's state law rights and Bankruptcy Code section 552(b). As such, the bankruptcy court properly held that the Disputed Cash and Adequate Protection Funds which had accumulated during QMECT's bankruptcy were the Secured Lenders' collateral regardless of whether the value of the Secured Lenders' collateral had increased during the case. Contrary to QMECT's argument, such a result is neither inequitable, nor does it constitute a windfall to the Secured Lenders because their cash collateral was the exclusive source of funds to finance QMECT's operations during the bankruptcy and the outstanding debt owed to the Secured Lenders is substantially greater than the value of their collateral.

In a nutshell, QMECT would effectively have this Court write section 552(b) out of the Bankruptcy Code and allow QMECT to realize the proceeds accumulated during its failed reorganization attempt in derogation of the Secured Lenders' property rights and contrary to Ninth Circuit law. QMECT's arguments must be rejected.

The bankruptcy court's decision to grant the Secured Lenders relief from the automatic stay was properly supported by the facts and applicable law. The bankruptcy court did not abuse its discretion in entering the Final Order. This Court should affirm the bankruptcy court's decision.

## ARGUMENT ON APPEAL

## I.   THE BANKRUPTCY COURT CORRECTLY FOUND THAT QMECT'S POST-PETITION ASSETS, INCLUDING THE ADEQUATE PROTECTION FUNDS AND DISPUTED CASH, WERE PROCEEDS OF THE SECURED LENDERS' COLLATERAL UNDER THEIR BLANKET LIENS

Bankruptcy Code section 552(b)(1) provides, in pertinent part, that:

> . . . [I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds . . . of such property, then such security interest extends to such proceeds . . . acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law,

-14-

except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise. 11 U.S.C. § 552(b)(1).[12]

In other words, section 552(b) provides that if a prepetition security interest encumbers collateral and its proceeds, any proceeds of that prepetition collateral remain subject to the prepetition security interest even if such proceeds were received post-petition. 11 U.S.C. § 552(b).

Whether a particular item of collateral constitutes "proceeds" within the meaning of section 552(b) is controlled by state law. 11 U.S.C. § 552(b); *Financial Sec. Assurance v. Days Cal. Riverside Ltd. P'ship* (*In re Days Cal. Riverside Ltd. P'ship)*, 27 F.3d 374, 376 (9th Cir. 1994). Furthermore, as stated by the Ninth Circuit, courts should adopt "the broadest possible definition" for the term "proceeds." *Fifteenth RMA Partners, L.P. v. Pacific/West Communs. Group, Inc. (In re Pacific/West Communs. Group Inc.)*, 301 F.3d 1150, 1153 (9th Cir. 2002).

Under California law, a security interest in collateral gives the secured party rights to the proceeds of such collateral as provided by section 9315 of the California Commercial Code. Cal. Comm. Code § 9203(f).[13] Furthermore, section 9102(64) of the Commercial Code defines the term "proceeds" broadly as follows:

> (A)    Whatever is *acquired* upon the sale, lease, license, exchange or *other disposition* of *collateral*.
>
> (B)    Whatever is *collected* on, or distributed on account of, collateral.
>
> (C)    Rights arising out of collateral. . . . Cal. Comm. Code § 9102(64)(emphasis added).

Additionally, section 9102(12) of the Commercial Code clarifies that proceeds of collateral

---

[12]  The "equities of the case" exception was not relied on by the bankruptcy court or found to be applicable in the case. (*See* App. 102:24-26, n 7.) QMECT did not rely on the "equities of the case" exception below (*see* App. 76:6-77:20), nor does it claim in the opening brief on appeal that the exception applies. Furthermore, the case law interpreting the "equities of the case" exception has routinely rejected a debtor's request to invalidate a portion of a secured creditor's lien and deprive the secured creditor of the post-petition appreciation in its collateral where the bankruptcy estate did not expend any funds otherwise available to general unsecured creditors to generate the post-petition assets. *See In re Tower Air, Inc.*, 397 F.3d 191, 202 (3rd Cir. 2005); *In re Muma Servs.*, 322 B.R. 541, 559 (Bankr. D. Del. 2005). Moreover, as a procedural matter, there is no evidentiary record from which the "equities of the case" exception could be applied in any event. *See J. Catton Farms, Inc. v. First Nat'l Bank*, 779 F.2d 1242, 1246-47 (7th Cir. 1985)(bankruptcy court to apply the equities of the case exception, if appropriate, not the appellate court); *Smith v. Dairymen, Inc.*, 790 F.2d 1107, 1112-13 (4th Cir. 1986).

[13]  Revised Article 9 is applicable to the current case. Cal. Comm. Code § 9701.

-15-

automatically become part of the collateral. Cal. Comm. Code § 9102(12)(A)("Collateral' . . . includes . . . proceeds to which a security interest attaches."). Thus, by virtue of the definition of collateral, proceeds of proceeds constitute a secured creditor's collateral, as a matter of law.

The only limitation on a creditor's security interest in proceeds under section 9315(a)(2) of the Commercial Code is that a security interest automatically attaches to "identifiable" proceeds of the collateral. Cal. Comm. Code. § 9315(a)(2); *see also In re Gibson Products of Arizona*, 543 F.2d 652, 655 (9th Cir. 1976)("security interest continues in any identifiable proceeds received by the debtor from the sale or disposition of the collateral.").[14] Ordinarily, this means a secured creditor must demonstrate that the proceeds are related to its original collateral.[15] Notably, QMECT does not challenge – nor could it – the foregoing applicable legal framework regarding the treatment of collateral and proceeds under California law.

Where a secured creditor holds a blanket lien on a debtor's assets, courts have examined whether the debtor's post-petition assets were generated by anything other than the collateral subject to blanket lien. For example, in *In re Bumper Sales, Inc.*, 907 F.2d 1430, 1439 (4th Cir. 1990), the Fourth Circuit determined that all post-petition receivables and cash generated by a debtor constituted "proceeds" of a secured creditor's prepetition blanket lien and thus remained subject to the secured creditor's lien under Bankruptcy Code section 552(b). In *Bumper*, the debtor granted the secured creditor a security interest in all its "inventory, accounts receivable, contract rights, furniture, fixtures and equipment, general intangibles, now owned or hereafter-acquired and the proceeds from said collateral." *Id.*, at 1432. Following its bankruptcy filing, the secured creditor consented to the use of its cash collateral, *without requiring the debtor to provide a replacement lien*, and the debtor continued to operate its business financed by the secured creditor's cash collateral. *Id.*, at 1433. More than eight months after the case was filed, the

---

[14] California Commercial Code section 9315 replaced the former California Commercial Code section 9306 regarding a secured creditor's rights to proceeds.

[15] The California Commercial Code does not provide guidance for determining whether proceeds are sufficiently traced to a secured creditor's collateral. As such, courts resort to common law tracing principles, including the lowest intermediate balance rule, for commingled funds (which the bankruptcy court directed to be used by the Secured Lenders in tracing their collateral). *See Chrysler Credit Corp. v. Superior Court*, 17 Cal.App.4th 1303, 1315-16 (1993).

-16-

creditors' committee in the case argued that because the secured creditor did not have a replacement lien on the debtor's assets, under Bankruptcy Code section 552(a) it had lost its lien on all the post-petition accounts receivable, inventory and cash generated by the debtor because the assets constituted after acquired property and were not identifiable proceeds of the secured creditor's prepetition collateral.[16]

The Fourth Circuit readily rejected the committee's arguments, noting that under the Uniform Commercial Code, proceeds included "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." *Id.*, at 1437. Because of the secured creditor's blanket lien, if cash collateral is spent by the debtor, any subsequent accounts receivable that arise out of such expenditures automatically become the secured creditor's collateral because they constitute proceeds. Thus, the Fourth Circuit determined that even without a replacement lien, the post-petition accounts receivable and cash were all the proceeds of the secured creditor's prepetition collateral and subject to the secured creditor's liens.[17]

Likewise, in *In re Package Design & Supply Co.*, 217 B.R. 422 (Bankr. W.D.N.Y. 1998), the court considered whether Citibank, which had a prepetition blanket lien on the debtor's assets, retained a lien on post-petition accounts receivable and inventory without the benefit of a replacement lien. The court, citing *Bumper* as the leading case, held that because of Citibank's blanket lien on prepetition assets, the debtor's post-petition accounts receivable and inventory would be the proceeds of Citibank's prepetition liens and therefore Citibank's collateral in accordance with section 552(b), so long as the debtor did not fund its post-petition operations with unencumbered funds that would have otherwise been available to unsecured creditors.

> In the case at Bar, the *Bumper* fact pattern seems to exist. It seems clear that Citibank had a perfected lien on every asset of the Debtor. It appears that none of the Debtor's present assets were enhanced by postpetition extensions of credit by others (at least none that have not since been repaid with Citibank's cash collateral), or enhanced by some unencumbered cash infusion, or the like. *Id.*, at 427.

---

[16] Bankruptcy Code section 552(a) provides: "Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a).

[17] Here, the Secured Lenders were given a replacement lien; thus, as discussed *infra*, the Secured Lenders held a security interest in QMECT's post-petition assets under the replacement lien, in addition to their lien rights under Bankruptcy Code section 552(b).

-17-

Thus, under *Package Design*, so long as Citibank was undersecured as of the petition date, and the debtor's operations had not been funded by unencumbered cash infusions that would have gone to unsecured creditors, Citibank automatically held a valid lien on the post-petition accounts receivable and inventory by virtue of its prepetition blanket lien.

Similarly, in *In re Sherwood Ford, Inc.*, 125 B.R. 957, 962 (Bankr. D. Md. 1991), a secured creditor held a security interest in substantially all a debtor's assets. The court found the debtor's post-petition cash and accounts receivable were the proceeds of the secured creditor's prepetition collateral. The court stated

> "[i]n the instant case, even though the trustee contends that Ford Motor Credit cannot now trace the proceeds of its prepetition collateral, his position is untenable because he concedes that the debtor's postpetition operations *were financed exclusively by the use of Ford Motor Credit's collateral, cash and otherwise*." *Id.* (Emphasis added).

Thus, because the debtor financed its operations with cash collateral belonging to the secured creditor, the court in *Sherwood Ford* found that all post-petition accounts receivable and cash were part of the secured creditor's prepetition collateral. *Id.*, at 962-63.

Here, unquestionably, the remaining assets and Adequate Protection Funds constitute proceeds of the Secured Lenders' prepetition collateral and therefore were subject to the Secured Lenders' prepetition security interests. As set forth above, there is no dispute that: (1) the Secured Lenders held a blanket lien on virtually all QMECT's assets as of the petition date, including QMECT's accounts receivable, inventory, real estate, furniture, fixtures, general intangibles and equipment[18]; (2) the Secured Lenders' security interests, by their terms, extended to the proceeds of the Secured Lenders' collateral; and (3) the value of the Secured Lender' collateral at the petition date was less than the combined amount of their claims. (App. 82:12-22).

Moreover, the bankruptcy court found, based on the Secured Lenders' evidence (which was uncontroverted), that all of the proceeds of the Post-Petition Loan were used to pay pre-petition obligations of QMECT *and did not finance the creation of any of QMECT's post-petition assets (including the Adequate Protection Funds and Disputed Cash)*. (App. 91:12-19, 92:7-21, 103:20-

---

[18]   As noted previously, the bankruptcy court also found that all of QMECT's cash as of the petition date were the proceeds of the Secured Lenders' collateral.

-18-

24.)[19]  Instead, QMECT's post-petition operations and the post-petition assets generated thereby were financed exclusively through the use of the Secured Lenders' cash collateral.[20]  Contrary to QMECT's arguments (*see* Opening Brief, at p. 7:25-8:9), the Secured Lenders' cash collateral, and that cash collateral alone, paid for the utilities that powered QMECT's plant and equipment, paid for QMECT's insurance during the bankruptcy, paid for the lease payments, and paid for all of QMECT's employee costs, whether they were for production, accounting, management or sales personnel.[21]  QMECT had no source of funds other than the Secured Lenders' cash collateral to finance its post-petition operations.

As such, the bankruptcy court's factual findings were not clearly erroneous, nor, as *Bumper*, *Package Design* and *Sherwood* demonstrate, did the bankruptcy court err as a matter of law in applying Bankruptcy Code section 552(b) or the California Commercial Code, or in concluding that all the remaining assets (i.e., the Disputed Cash) and Adequate Protection Funds constituted the "proceeds" of the Secured Lenders' prepetition collateral.[22]

---

[19]  In its opening brief, QMECT concedes the bankruptcy court's factual findings that all of the proceeds of the Post-Petition Loan were used to pay pre-petition obligations.  (*See* Opening Brief, at p. 7:5-7.)  As it is QMECT's burden to show clear error in the bankruptcy court's factual findings on appeal, if QMECT so claimed (*see Drehsen v. Bank of St. Petersburg (In re Drehsen),* 190 B.R. 441, 442 (D. M.D. Fla. 1995), the bankruptcy court's factual findings on tracing cannot be set aside.  *See* Fed. R. Bankr. P. 8013.

[20]  The proceeds of the Post-Petition Loan were not otherwise available to pay either administrative or general unsecured creditors of the estate in any event, as Fitzpatrick was required to be repaid principal and interest on a superpriority basis.

[21]  QMECT's attempt to analogize this case to Mr. Glassblower in his individual bankruptcy misses the mark.  QMECT's employee costs were all financed by the Secured Lenders' collateral; what the employees produced were proceeds of the Secured Lenders' collateral.

[22]  As *Bumper*, *Package Design,* and *Sherwood* demonstrate, the bankruptcy court's conclusions were grounded not only in Bankruptcy Code § 552(b)(1), but also in analogous case law.  As such, QMECT's statement that the bankruptcy court established some novel legal principle in the case (*see* Opening Brief, at p. 8:17) is wrong.  Likewise, QMECT's argument that the bankruptcy court's conclusion is "contrary to the entire purpose of a Chapter 11 reorganization" (*see* Opening Brief, at p. 9:14-15), is wrong.  *Bumper*, *Package Design,* and *Sherwood* all involved chapter 11 reorganizations.  Notably, QMECT cites no authority for its bald assertion.  By contrast, the court in *Bumper Sales* explained that after acquired property clauses are affected by Bankruptcy Code § 552(a), but "proceeds" coverage remains valid under Bankruptcy Code § 552(b) and applicable state law.  *Bumper Sales*, 907 F.2d at 1436-38; *see also* 5 Collier on Bankruptcy, Prepetition Effect of Security Interest, ¶ 552.02[1], n.3, at p. 552-7 (15th Ed. 2006).  Nor does section 552(b) thwart any purpose of the Bankruptcy Code.  Rather it simply strikes a balance, preserving a secured creditor's rights to proceeds before and after bankruptcy while allowing the debtor to use other assets that are not proceeds of collateral.  *Bumper Sales*, 907 F.2d at 1436-38; *see also In re Days California*, 27 F.3d at 375.  Moreover, this case involved a failed reorganization in which QMECT stipulated that the Secured Lenders were entitled to relief from the automatic stay to foreclose on their collateral.

704126.05/SF

Despite the foregoing, QMECT argues that *Skagit Pacific* is most instructive. Parsing language from *Skagit Pacific*, QMECT argues that Bankruptcy Code section 552(a) cuts off a security interest in property acquired by the debtor after the petition date even if there is an after-acquired clause in the underlying security agreement, and that proceeds of post-petition accounts receivable do not fall within the section 552(b) exception. (*See* Opening Brief at p. 12:7-17.) QMECT is wrong.[23]

In *Skagit Pacific*, however, the secured creditor *did not have a blanket security interest*; it did not have a security interest in the debtor's vehicle and trailer inventory. *Skagit Pacific*, 316 B.R. at 333. Nor did the secured creditor obtain a replacement lien during the bankruptcy. Furthermore, the bank account into which the debtor deposited money from equipment and inventory sales and from collection of accounts receivable, contained commingled funds (i.e., the bank account also held proceeds that were not encumbered by the secured creditor's liens). *Id.* at 340. Moreover, the funds in the commingled account were used to pay post-petition operating expenses. *Id.* Nevertheless, despite the lack of a blanket security interest and the fact that commingled funds were used to pay post-petition operating expenses, the court in *Skagit Pacific* still held that the secured creditor could assert a proceeds security interest in the disputed post-petition accounts receivable, if, under state law, the secured creditor could trace the receivable as identifiable proceeds of the secured creditor's pre-petition collateral using the lowest intermediate

---

The Ninth Circuit has made it clear that following a failed reorganization, a secured creditor is entitled to recover the accumulated proceeds generated during the attempt. *See 1441 Veteran Street*, 144 F.3d at 1291-92.

[23] Notably, QMECT's argument would read Bankruptcy Code section 552(b) out of the Code, despite the introductory phrase of section 552(a) which is expressly qualified by subsection (b). Moreover, the plain language of Bankruptcy Code section 552(b) extends a secured creditor's interest to proceeds acquired after the bankruptcy to the extent provided by applicable nonbankruptcy law. *In re Machinery, Inc.*, 287 B.R. 755, 764 (Bankr. E.D. Mo. 2002)("the plain language of § 552(b)(1) clearly dictates that a pre-petition security interest in proceeds encumbers post-petition proceeds"); *see also* 5 Collier on Bankruptcy, *supra*, ¶ 552.02[1] (section 552(b) recognizes that most modern security agreements cover proceeds of collateral and that when a prepetition security agreement extends to proceeds of collateral, the terms of the security agreement and applicable nonbankruptcy law will be enforced against proceeds acquired after the petition date). Here, the post-petition accounts receivable are proceeds of the Secured Lenders' collateral under California commercial law, just as undoubtedly they would be had QMECT not filed for bankruptcy. *See 1441 Veteran Street*, 144 F.3d at 1290-91 ("section 552(b) of the Code provides that secured creditors shall enjoy the same rights to postpetition rents and proceeds that they would have under state law").

-20-

balance method. *Id.* at 337-38. In *Skagit Pacific*, the secured creditor was unable to provide the required tracing evidence. *Id.* at 338-39.

Here, unlike *Skagit Pacific*, the Secured Lenders held a blanket lien on substantially all of QMECT's assets. Furthermore, unlike *Skagit Pacific*, QMECT's post-petition operations and the assets generated thereby were financed exclusively by the Secured Lenders' cash collateral. Moreover, unlike *Skagit Pacific*, the Secured Lenders traced their pre-petition security interest into QMECT's post-petition assets using the lowest intermediate balance rule. (App. 99:25-100:9, 103:11-24.) Thus, notwithstanding the generalized comments from *Skagit Pacific* cited by QMECT, the case supports the Secured Lenders' position when applied to the facts of this case.

In addition to *Skagit Pacific*, QMECT cites two other cases it claims are "operative here": *In re Wallman*, 71 B.R. 125 (Bankr. D.S.D. 1987) and *In re Northeastern Copy Services., Inc.*, 175 B.R. 580 (Bankr. E.D. Pa. 1994). (Opening Brief, at p. 12:22-24.) Neither of the two cases is controlling, let alone operative here.

*Wallman* involved a farm bankruptcy and secured party's rights in growing crops. Unlike here, the post-petition agreement entered into between the parties omitted a provision that the secured party had a future interest in the debtor's crops. *In re Wallman*, 71 B.R. at 127. Moreover, the secured creditor in *Wallman* did not have a blanket lien on all of the debtor's assets.

Notably, the court in *Wallman* recognized that proceeds of collateral may be secured by a prepetition security interest if the collateral that produced the proceeds was acquired by the debtor prepetition. *Id.* at 128; *see also Bumper Sales*, 907 F.2d at 1439 (discussing second generation crops as proceeds subject to a secured creditor's security interests). Here, the Secured Lenders held a blanket lien on QMECT's assets and they traced QMECT's post-petition assets to their prepetition collateral. No other assets generated the post-petition assets. Furthermore, the proceeds of the Secured Lenders' prepetition collateral then became proceeds of proceeds, as the Secured Lenders' cash collateral was used during the bankruptcy which, under California law was the Secured Lenders' collateral as well. *See* Cal. Comm. Code §§ 9102(12) & (64)(proceeds includes whatever is acquired upon sale or disposition of the collateral and proceeds of collateral automatically become part of the collateral).

-21-

*Northeastern Copy Services* is similarly distinguishable. There, the secured creditor again did not have a blanket security interest in the debtor's assets. Instead, its only valid security interest was in the debtor's equipment, machinery and inventory. *In re Northeastern Copy Servs.*, 175 B.R. at 583-84. Moreover, the debtor did not use the secured creditor's cash collateral to finance its operations or to generate the post-petition assets in question. *Id.* Here, the Secured Lenders held a blanket lien on QMECT's assets and QMECT financed its post-petition operations exclusively with the Secured Lenders' cash collateral; no other funds were used to generate the post-petition assets. As such, all of the QMECT's post-petition assets are proceeds of the Secured Lenders' collateral.

QMECT also cites *In re Wabash Valley Power Association*, 72 F.3d 1305, 1321 (7th Cir. 1996), *cert. denied*, 519 U.S. 965 (1996), as noting "the general principle that secured creditors are not entitled to post-petition acquired property." (Opening Brief, at p. 11:23-25.) While the court in *Wabash Power* did note that a secured creditor is not ordinarily entitled to any property acquired by the debtor after the commencement of the case (citing 11 U.S.C. § 552(a)), it expressly noted the exception under section 552(b) when the security agreement provides that the security interest extends to proceeds of collateral. *In re Wabash Power Ass'n*, 72 F.3d at 1322. More importantly, unlike the present case, the court observed that the secured creditor had not argued section 552(b) applied. *Id.*

Last, QMECT makes a vague reference to an alleged inconsistency with the Secured Lenders' position compared with Bankruptcy Code section 547(c)(5). (Opening Brief, at p. 12:26-13:5.) First, the Bankruptcy Code section at issue in this appeal is section 552(b), not section 547(c)(5). Second, and most importantly, the argument rests on a false premise: that the Secured Lenders improved their position. Instead, the Secured Lenders held a blanket lien on QMECT's assets prepetition and are entitled to retain that position in QMECT's assets post-petition to the extent of the outstanding indebtedness owed and absent any funds other than the Secured Creditors' cash collateral generating the post-petition assets. Third, QMECT's argument about an alleged improvement in position being subject to a potential preference attack has been rejected, where, as here, the secured creditor held a blanket lien and was undersecured. *See*

-22-

APPELLEES AND CROSS-APPELLANTS' BRIEF ON APPEAL AND CROSS-APPEAL

*Sloan v. Zions First Nat'l Bank, N.A. (In re Castletons, Inc.)*, 990 F.2d 551, 555 (10th Cir. 1993);

*In re El Paso Refinery, L.P.*, 171 F.3d 249, 254 (5th Cir. 1999).

## II.    THE BANKRUPTCY COURT CORRECTLY FOUND THAT THE SECURED LENDERS' PROCEEDS SECURITY INTEREST COULD INCREASE IN VALUE AFTER THE PETITION DATE

After properly concluding that the Secured Lenders' security interests extended to the remaining assets and Adequate Protection Funds as proceeds of the Secured Lenders' prepetition collateral under 11 U.S.C. § 552(b)(1), the bankruptcy court then also properly concluded that the Secured Lenders' proceeds security interest in such assets could, based on *1441 Veteran Street* and applicable law, increase in value during the bankruptcy and inure to the benefit of the Secured Lenders.  (App.  103:7-26.)[24]

In *1441 Veteran Street*, the Ninth Circuit determined that any post-petition appreciation in a secured creditor's collateral automatically inures to the benefit of the secured creditor pursuant to its state law rights. *Id.*, at 1292.  There, the Ninth Circuit rejected an attempt by the debtor's professionals to strip down a secured creditor's rights to post-petition rents under Bankruptcy Code section 552(b) based upon a prior valuation of the property under Bankruptcy Code section 506(a). The Ninth Circuit ruled that the post-petition rents "constituted [the secured creditor's] collateral and, thus, were an improper source" for the payment of administrative fees. *Id.*  In so ruling, the Ninth Circuit relied heavily upon the Supreme Court's ruling in *Dewsnup*:

> The [Dewsnup] Court also observed that the practical effect of accepting the debtor's argument would be "to freeze the creditor's secured interest at the judicially determined valuation," an approach where any increase in the value of the property by the time of foreclosure would result in a windfall to the debtor. *Id.*  The Court held that "any increase over the judicially determined valuation during the bankruptcy rightly accrues to the benefit of the [secured] creditor." *Id.*, at 1291 (citing *Dewsnup*, 502 U.S. 410, 112 S.Ct. 773-777 (1992)).

---

[24]  As discussed previously, the Secured Lenders dispute that the value of their collateral increased during the bankruptcy, and in fact, the bankruptcy court concluded, based on persuasive expert testimony, that the value of the Secured Lenders' collateral declined by more than $1 million during the case.  Moreover, as it is undisputed, that the Secured Lenders were undersecured, the Secured Lenders submit that the inquiry should have ended there based on the conclusion that the remaining assets and Adequate Protection Funds were the Secured Lenders' collateral.  The Ninth Circuit in *1441 Veteran Street* held that following a failed reorganization attempt where an undersecured creditor is granted relief from the automatic stay, a valuation serves no legitimate purpose and should not affect a secured creditor's rights. *1441 Veteran Street*, 144 F.3d at 1292.

-23-

Furthermore, the Ninth Circuit in *1441 Veteran Street* emphasized that the principles of *Dewsnup* apply following a failed reorganization attempt. *Id.*, at 1293. The Ninth Circuit also emphasized that the federal statutory purpose must be clear and manifest to disturb a creditor's traditional state law rights, especially where, as in section 552(b), the Bankruptcy Code explicitly refers to nonbankruptcy law and provides that a secured creditor "shall enjoy the same rights to post-petition rents and proceeds that they would have under state law." *Id.*, at 1290-91.

QMECT's argument that it is entitled to the Disputed Cash and Adequate Protection Fund because the value of the Secured Lender's security interest increased during the bankruptcy flies in the face of *1441 Veteran Street* and *Dewsnup* which hold that a secured creditor's interest in its collateral is not fixed or frozen at the inception of a bankruptcy case.[25]

QMECT's sole attempt to distinguish *1441 Veteran Street* is that it is a "rents" case involving real property. (Opening Brief, at p. 10:23-11:22.) However, the plain language of 11 U.S.C. § 552(b) undermines QMECT's argument. Congress treated "rents" and "proceeds" equally under section 552(b). *See* 11 U.S.C. § 552(b)(1) & (2)(parallel treatment for "proceeds" and "rents"). There is no basis in law to distinguish between rents, which are the proceeds of real property, and proceeds of personal property. A security interest in "proceeds" is entitled to the same protection as a security interest in "rents." Under section 552(b), the sole question as to both items of collateral is whether the secured creditor's prepetition security interest extends to property acquired before the case and to the rents or proceeds from such collateral. Indeed, the Ninth Circuit in *1441 Veteran Street* confirmed there is no such distinction, stating that under section 552(b) "secured creditors shall enjoy the same rights to postpetition rents and proceeds that they would have under state law." Thus, QMECT's attempt to distinguish *1441 Veteran Street* on the basis that it is a "rents" case fails. As the bankruptcy court held, *1441 Veteran Street* is not only controlling on the section 552(b) issue, but it is also persuasive.

Other courts considering a secured creditor's right to the increased value of its collateral resulting from accumulated proceeds during a bankruptcy have reached the same conclusion as

---

[25]  In effect, QMECT is attempting to add a substantive limitation to a secured creditor's rights under section 552(b) even though there is no such limitation in the Bankruptcy Code.

*Dewsnup* and *1441 Veteran Street*.  For example, in *In re Veeco Inv. Co. L.P.*, 170 B.R. 149 (Bankr. E.D. Mo. 1994), the court held that when a secured creditor holds a pre-petition perfected security interest in proceeds, under section 552(b), any proceeds generated post-petition are the secured creditor's collateral and increase the value of the secured creditor's secured claim.  *Id.* at 153; *see also In re Tower Air,* 397 F.3d at 198-99 (rejecting an argument that a secured creditor's security interest in proceeds under section 552(b) was "windfall" and stating the "creditor simply gets the benefit of all increases in value of the collateral – whether those increases come by appreciation or by insurance payments – up to the total value of the claim").

Likewise, the court in *Machinery, Inc.* considered, and rejected, a debtor's argument that a secured creditor was not entitled to the post-petition appreciation in the value of its collateral caused by the accumulation of proceeds.  There, similar to the instant case, GE held a blanket lien.  During the bankruptcy case, the court permitted the debtor to use cash collateral conditioned upon, among other things, the debtor granting GE a replacement lien.  Almost five months after the case was filed, and after the debtor had consumed a substantial amount of GE's cash collateral, the debtor filed a motion seeking to value GE's collateral under section 506(a).  *Id.*, at 759.  The debtor argued that GE's secured claim was limited to the value of GE's collateral as of the petition date.  The court rejected the debtor's argument, relying on *Dewsnup* and the plain language of section 552(b)(1).[26]  The court reasoned that depriving a secured creditor of the appreciation in its collateral would invalidate the secured creditor's security interest in post-petition proceeds expressly provided under section 552(b)(1) and was contrary to *Dewsnup*.  *Id.*, at 764-66.  As such, the court held – as the court found the vast majority of the other courts considering the issue have held - that GE's secured claim included the proceeds of its prepetition collateral and any increase in the value of that collateral inured to GE's benefit.  *Id.*[27]

_____

[26] QMECT attempts to distinguish *Machinery, Inc.* by characterizing it as just like the real estate cases.  (Opening Brief, at p. 12:1-6.)  As discussed *supra*, this argument is without merit.  Likewise, QMECT's comment that the case "has nothing to do with what else might have been purchased with that cash," is irrelevant.  All of QMECT's post-petition operations were financed by the Secured Lenders' cash collateral.

[27] In *Machinery, Inc.*, the court also rejected the approach in *In re Reddington/Sunarrow Ltd. P'ship*, 119 B.R. 809 (Bankr. D. N.M. 1990), cited in QMECT's opening brief.  Both the bankruptcy court below and the court in *Machinery, Inc.* observed that *Reddington/Sunarrow Ltd.* was clearly the minority view.  Notably, *Reddington/Sunarrow Ltd.* was decided before

704126.05/SF | APPELLEES AND CROSS-APPELLANTS' BRIEF ON APPEAL AND CROSS-APPEAL

Notwithstanding the foregoing authority, QMECT appears to suggest that there is something unfair about the Secured Lenders realizing the increased value of their proceeds security interest which accumulated during QMECT's bankruptcy.  As set forth above, there was no such increase.  Furthermore, as discussed previously, QMECT did not rely below, nor does it rely in its opening brief, on the "equities of the case" exception.  Even if QMECT had made such an argument, it would fail.

*In re Muma Services.* and *In re Tower Air*, *supra*, both explored the limits of a bankruptcy court's right to cut-off a proceeds security interest under the "equities of the case" exception of section 552(b).  Both courts recognized that a secured creditor is entitled to the improvement in the value of its collateral unless the estate expends funds that would otherwise be available to general unsecured creditors.  *Muma Servs.*, 322 B.R. at 559; *Tower Air*, 397 F.3d at 205.

As the Court in *Muma* stated:

> The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of the estate (which normally would go to general creditors) to cause the appreciated value. [citations omitted]. . . . In this case, neither the Debtors nor the Trustee invested any unencumbered funds available to the general unsecured creditors to enhance the value of the assets which were sold to Sea Star.  On the contrary, since all assets were the security of the Bank Group, it was only through the use of the Bank Group's cash collateral . . . that the estate was able to continue to operate and maintain the value of the assets. . . . The equities of this case do not support further eroding the Bank Group's collateral position under section 552(b)(1). *Muma*, 322 B.R. at 558-59.

Here, the undisputed facts are that QMECT's post-petition operations were funded exclusively by the Secured Lenders' cash collateral.  No other unencumbered estate funds were used to generate QMECT's post-petition assets or to increase the Secured Lenders' collateral.  As such, the "equities of the case" exception would fail, even if it was argued.

Under the foregoing authority, the bankruptcy court's decision that the Secured Lenders are entitled to foreclose on the remaining assets and Adequate Protection Funds irrespective of whether they appreciated in value post-petition finds ample legal support , and should be affirmed.

---

the Supreme Court's decision in *Dewsnup.*  Moreover, the court in *Reddington/Sunarrow Ltd.* did not consider Bankruptcy Code section 552(b) or its impact on post-petition rents.

-26-

**III.    THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION IN ENTERING THE FINAL ORDER AND GRANTING THE SECURED LENDERS RELIEF FROM THE AUTOMATIC STAY**

As discussed above, the "decision to grant or deny relief from the automatic stay is committed to the sound discretion of the bankruptcy court." *Conejo Enters.*, 96 F.3d at 351. Under 11 U.S.C. § 362(d), the bankruptcy court could grant the Secured Lenders relief from the automatic stay to foreclose on their collateral for cause, including a lack of adequate protection, or because QMECT did not have any equity in the subject property and the property was not necessary to an effective reorganization. *See* 11 U.S.C. § 362(d).

Here, QMECT stipulated to relief from the automatic stay at the preliminary hearing on the Secured Lenders' Relief from Stay Motion on March 16, 2006. The only dispute thereafter was whether the remaining assets and Adequate Protection Funds were the Secured Lenders' collateral. The preceding sections clearly demonstrate that the bankruptcy court carefully evaluated whether, and properly concluded that, the remaining assets and Adequate Protection Funds were the Secured Lenders' collateral. The bankruptcy court's conclusions of law in this regard were not erroneous, nor were its findings of fact clearly erroneous (indeed, how could they be given that it was undisputed the Secured Lenders were undersecured and QMECT's post-petition operations and assets were financed exclusively by the Secured Lenders' cash collateral). *See Conejo Enters.*, 96 F.3d at 351; *In re Lazar*, 83 F.3d at 308. As such, the bankruptcy court did not abuse its discretion in granting the Secured Lenders relief from the automatic stay to foreclose on the remaining assets and Adequate Protection Funds, and this Court should affirm the Final Order.

**SUMMARY OF ARGUMENT ON CROSS-APPEAL**

The bankruptcy court entered orders during the case granting the Secured Lenders replacement liens in QMECT's post-petition assets in exchange for QMECT's continued use of the Secured Lenders' cash collateral. The replacement liens were in addition to the Secured Lenders' prepetition security interests, and covered the same types of property that constituted the Secured Lenders' prepetition collateral, as well as QMECT's cash and deposit accounts. The orders clearly stated that the replacement liens attached to QMECT's then existing property and also to QMECT's property acquired thereafter during the bankruptcy. The orders further provided that

the replacement liens were fully perfected, first priority liens "without the necessity of further action" by the Secured Lenders.  The replacement liens were granted to avoid any argument that the Secured Lenders' prepetition security interests were somehow cut-off or impaired during the bankruptcy, and to avoid arguments that the Secured Lenders would later be required to trace their interests in QMECT's property as identifiable proceeds of their prepetition collateral.  However, when the Secured Lenders attempted to enforce their replacement liens, the bankruptcy court refused, informing the Secured Lenders that they would first have to establish that their collateral had diminished in value during the bankruptcy before they could rely on the replacement liens, a condition that was not stated in the orders.

QMECT, in accordance with Bankruptcy Code section 363, was also ordered to make payments to the Secured Lenders' attorneys for the Secured Lenders' benefit as adequate protection for QMECT's use of the Secured Lenders' cash collateral during the case.  QMECT made the payments, which accumulated and represent the Adequate Protection Funds.  The orders directing the payments did not condition the Secured Lenders receipt of the Adequate Protection Funds on the Secured Lenders first establishing that their collateral had diminished in value during the bankruptcy.  Yet when the Secured Lenders sought to obtain the Adequate Protection Funds as part of the Relief from Stay Motion, the bankruptcy court informed the Secured Lenders that they would again first have to show a diminution in value of their collateral during the bankruptcy, or otherwise prove that the Adequate Protection Funds were proceeds of the Secured Lenders' prepetition collateral (which the Secured Lenders did) before being allowed to obtain the funds.

While the bankruptcy court ultimately granted the Secured Lenders relief from the automatic to foreclose on their collateral, principally relying on Bankruptcy Code section 552(b) and applicable nonbankruptcy law, the Secured Lenders maintain that the bankruptcy court should have allowed them to enforce their replacement liens without showing a diminution in value of their collateral during the bankruptcy, rather than requiring them to trace QMECT post-petition assets as proceeds of the Secured Lenders' prepetition collateral.  The Secured Lenders also maintain that the bankruptcy court should have allowed the Secured Lenders to obtain the Adequate Protection Funds when they moved for relief from the automatic stay without first

-28-

showing a diminution in value of their collateral during the bankruptcy or without proving the

Adequate Protection Funds were proceeds of the Secured Lenders' prepetition collateral.

**ARGUMENT ON CROSS-APPEAL**

**I.    THE BANKRUPTCY COURT SHOULD HAVE ALLOWED THE SECURED LENDERS TO FORECLOSE ON THEIR REPLACEMENT LIENS WITHOUT FIRST REQUIRING THEM TO ESTABLISH THAT THEIR COLLATERAL HAD DIMINISHED IN VALUE DURING THE BANKRUPTCY**

During the bankruptcy case, the Secured Lenders' were granted replacement liens as follows:

> "a.    . . . a replacement lien (the "Adequate Protection Liens") *on and in the types of assets identified in the prepetition loan documents* executed by [QMECT] in favor of [Burlingame] and [Electrochem Funding] or their predecessors in interest (the "Adequate Protection Collateral") . . . .  The Adequate Protection Liens *shall be fully perfected, first priority liens* as to the parties other than [the Secured Lenders] *without the necessity of further action by or on behalf of [the Secured Lenders]*; shall have the same priority as existed prior to the commencement date of [QMECT's] chapter 11 case; *and shall attach to all Adequate Protection Collateral whether now owned or hereafter acquired.*
>
> b.    The Adequate Protection Collateral shall also include [QMECT's] right, title and interest in cash and deposit and investment accounts including proceeds of borrowings made by [QMECT] in this Chapter 11 case."  (App.  2:18-3:11.)

Thus, post-petition (i.e., during the bankruptcy), the Secured Lenders were granted fully perfected, first priority liens in all of the types of QMECT's property that constituted the Secured Lenders' prepetition collateral, and in QMECT's cash and deposit accounts.  *See* 11 U.S.C. § 101 (36) (judicial lien may be created by legal proceeding); *Small v. Beverly Bank*, 936 F.2d 945, 948 (7th Cir. 1991).  The replacement liens were unconditional.  No further action was required of the Secured Lenders under the clear terms of the orders.  Moreover, the orders made clear that the replacement liens attached to all of the subject collateral then owned by QMECT during the bankruptcy and all such collateral thereafter acquired by QMECT during the bankruptcy.

Bankruptcy Code section 363(e) requires the bankruptcy court to prohibit or condition a debtor's use of a secured creditor's collateral as necessary to provide the secured creditor adequate protection of the collateral.  *See* 11 U.S.C. § 363(e); *In re Waste Conversion Tech., Inc.*, 205 B.R. 1004, 1007 (D. Conn. 1997) ("adequate protection is recognized as a fundamental right afforded secured creditors in bankruptcy proceedings").  Because a debtor's use of a secured creditor's

-29-

collateral during a reorganization attempt deprives the secured creditor of its interest in the property, the adequate protection provided by the bankruptcy court must be "completely compensatory" and of "the most indubitable equivalence." *Id.* When a bankruptcy court grants a secured creditor a perfected replacement lien on the debtor's post-petition assets, it is the *quid pro quo* for allowing the debtor's continued use of the secured creditor's cash collateral. *Id.* at 1008-09 (reversing a bankruptcy court's modification of the 5th cash collateral order denying automatic perfection as failing to provide the creditor with the indubitable equivalent of its interest); *see also Small*, 936 F.2d at 948-50 (rejecting a attack on a secured creditor's replacement lien and holding that post-petition trade creditor's claim was subordinate).

Furthermore, here, the replacement liens were granted, in part, to obviate any question that, as QMECT argues, the Secured Lenders' proceeds security interest was somehow cut-off under 11 U.S.C. § 552(a). *See Skagit Pacific*, 316 B.R. at 336 ("Unless the court grants a replacement lien in new post-petition accounts receivable, the money used from the collected pre-petition accounts no longer creates proceeds under § 552(b)."); *see also Norton Bankruptcy Law and Practice*, § 87.22 (2nd Ed. 2006)(explaining that the act of providing a secured creditor with a replacement lien on post-petition assets to protect the secured creditor's interest in cash collateral is a form of cross-collateralization of the secured creditor's prepetition claim whereby a portion of the debtor's prepetition debt is then secured by the replacement lien on post-petition assets). The orders granting the replacement liens clearly provided that the liens covered not only the subject collateral then owned by QMECT, but also all of the identified types of collateral acquired by QMECT during the bankruptcy. This provision addressed directly the section 552(a) argument QMECT now makes. Thus, by granting the Secured Lenders replacement liens, the bankruptcy court preserved the Secured Lenders' rights in their collateral during the case, including the proceeds thereof, as they existed prepetition under state law.[28]

Despite the clear of the orders granting the replacement liens, as well as the purpose for

---

[28]  By contrast to this case, in *Skagit*, the secured creditor was required to trace the account receivable as identifiable proceeds of its pre-petition collateral in order to retain an interest in the receivable because the secured creditor did not obtain a replacement lien when it allowed the debtor to use its cash collateral. *Skagit Pacific*, 316 B.R. at 336-37.

-30-

them, the bankruptcy court refused to grant the Secured Lenders relief from the automatic stay to foreclose on the replacement liens unless the Secured Lenders first presented evidence showing a diminution in value during the bankruptcy case. (App. 81, n. 1, 88, n.5.) The cash collateral orders granting the replacement liens did not state that they were effective only if the Secured Lenders established that their collateral had diminished in value during the bankruptcy.

Instead, the orders granted the Secured Lenders fully perfected, first priority replacement liens "*without the necessity of further action by or on behalf of [the Secured Lenders].*" Furthermore, the orders granted the Secured Lenders lien rights in all of the types of QMECT's post-petition assets that constituted the Secured Lenders' collateral prepetition (i.e., a blanket lien on QMECT's assets), as well as QMECT's cash and deposit accounts. The Secured Lenders' security agreements with QMECT and their security interests in the subject collateral certainly did not provide that they remained effective following a bankruptcy only if the Secured Lenders proved a diminution in value during the bankruptcy. They were unconditional. Nor did QMECT seek to reform the security agreements and security interests to so provide.

Moreover, QMECT did not move to modify or amend the orders granting the replacement liens (*see* Fed. R. Bankr. P. 9023 & 9024), nor did QMECT appeal the orders (and instead benefited from them). The orders thus became final. *See Watson Pacific Ventures v. Valley Fed. Sav. & Loan (In re Safeguard Self-Storage Trust)*, 2 F.3d 967, 969 (9th Cir. 1993)(cash collateral orders are final orders subject to immediate appeal because of the irreparable harm that a creditor may suffer because of a debtor's use of cash collateral during the reorganization attempt); Fed. R. Bankr. P. 8002; *Anderson v. Mouradick (In re Mouradick)*, 13 F.3d 326, 327 (9th Cir. 1994) (the rigid enforcement of the time limits to file an appeal under Rule 8002 are "justified by the peculiar demands of a bankruptcy proceeding, primarily the need for expedient administration of the Bankruptcy estate aided by certain finality of orders issued by the Court in the course of administration"). As such, through the orders granting the replacement liens, the Secured Lenders were vested with property rights in QMECT's post-petition assets upon which the Secured Lenders' relied. While the bankruptcy court has the inherent equitable power to modify or vacate its own *interlocutory* orders (*see A&A Sign Co. v. Maughan*, 419 F.2d 1152, 1155 (9th Cir. 1969),

-31-

it was improper for the bankruptcy court to alter the *final* cash collateral orders *and the Secured Lenders' express property rights conferred thereby*.

As such, the bankruptcy court erred when it required the Secured Lenders to first show a diminution in value before they could foreclose on their replacement liens, especially when QMECT put forth no opposition to the Secured Lenders' position that they were entitled to relief from the automatic stay under 11 U.S.C. § 362(d). *See In re 1441 Veteran*, 144 F.3d at 1291-92 (valuation following a failed reorganization served no purpose).

**II.    THE BANKRUPTCY COURT SHOULD HAVE ALLOWED THE SECURED LENDERS TO OBTAIN THE ADEQUATE PROTECTION FUNDS WITHOUT REQUIRING THE SECURED LENDERS TO FIRST TO FIRST ESTABLISH THAT THEIR COLLATERAL HAD DIMINISHED IN VALUE DURING THE BANKRUPTCY OR THAT THE ADEQUATE PROTECTION FUNDS WERE THE PROCEEDS OF THEIR COLLATERAL**

Like the replacement liens, QMECT was required to make, and did make, payments to the Secured Lenders (i.e., the Adequate Protection Funds) during the bankruptcy case as further adequate protection for the Debtor's use of the Secured Lenders' property and cash collateral. (*See, e.g.,* App. 11:14-21.)  The bankruptcy court ordered the payments after it had determined that the payments were necessary to adequately protect the Secured Lenders' interests.  The cash collateral orders stated the Adequate Protection Funds were for the benefit of the Secured Lenders (and the Secured Lenders alone).  *Id.*  The cash collateral orders did not state the Secured Lenders would be required to show a diminution in value in their collateral during the bankruptcy before they would be allowed to obtain the Adequate Protection Funds.

Notwithstanding the court orders and payments by QMECT, QMECT nevertheless later claimed an interest in the Adequate Protection Funds, and the Court refused to allow Secured Lenders to obtain the Adequate Protection Funds under the cash collateral orders (as opposed to under 11 U.S.C. § 552(b)) unless they first established a diminution in value in their collateral during the bankruptcy.

As discussed above, QMECT did not appeal the cash collateral orders, which became final. Courts have repeatedly rejected efforts by debtors to be relieved of prior cash collateral orders entered in bankruptcy cases.  *See, e.g., Machinery*, 287 B.R. at 763; *In re Flagler-At-First Assocs.,*

704126.05/SF    APPELLEES AND CROSS-APPELLANTS' BRIEF ON APPEAL AND CROSS-APPEAL

114 B.R. 297, 302-04 (Bankr. S.D. Fla. 1990). Under Rule 9024 of the Federal Rules of Bankruptcy Procedure, it is improper to relieve a party (in this case QMECT) from the effect of the cash collateral orders, absent mistake, fraud, excusable neglect or similar cause. Fed. R. Bankr. P. 9024. There is no evidence of these circumstances in the case. Furthermore, Rule 9024 prohibits a court from reconsidering its orders once a year has passed following their entry. *Id.* Moreover, the bankruptcy court ordered the payments at the outset after determining that the Secured Lenders' interests were entitled to protection. Requiring the Secured Lenders to prove their entitlement a second time was unsupported by the orders and improper. As such, the bankruptcy court erred in retroactively re-writing the cash collaterals to re-cast the Adequate Protection Funds as merely constituting additional cash collateral unless the Secured Lenders first proved a diminution in value of their collateral during the bankruptcy.

## CONCLUSION

For the foregoing reasons, this Court should affirm the Final Order entered by the bankruptcy court granting the Secured Lenders relief from the automatic stay.

Dated: April 2, 2007

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP


By: _____ /s/ *William W. Huckins* _____
WILLIAM W. HUCKINS
Attorneys for Appellees and Cross-Appellants
Burlingame Capital Partners II, L.P. and Electrochem Funding, LLC

APPELLEES AND CROSS-APPELLANTS' BRIEF ON APPEAL AND CROSS-APPEAL

704126.05/SF

# ADDENDUM

# RELEVANT STATUTORY AUTHORITY

**Addendum**

**Relevant Statutory Authority**

**11 U.S.C. § 362(d)**

(d)     On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –

(1)     for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2)     with respect to a stay of an act against property under subsection (a) of this section, if –

(A)     the debtor does not have an equity in such property; and

(B)     such property is not necessary to an effective reorganization . . . .

**11 U.S.C. § 552 - Post-petition effect of security interest.**

(a)     Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b)(1)   Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

(2)   Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, and notwithstanding section 546(b) of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

-1-

704126.05/SF

APPELLEES AND CROSS-APPELLANTS' BRIEF ON APPEAL AND CROSS-APPEAL

# ADDENDUM

# CERTIFICATION OF INTERESTED PARTIES AND STATEMENT RE RELATED CASES

APPELLEES AND CROSS-APPELLANTS' BRIEF ON APPEAL AND CROSS-APPEAL

**Certification of Interested Parties and Statement re Related Cases**

The undersigned certifies that the following parties have an interest in the outcome of this appeal.  These representations are made to enable the Court to evaluate possible disqualification or recusal:

1.    QMECT, Inc.;

2.    John T. Kendall, as chapter 7 trustee of QMECT, Inc.;

3.    Electrochem Funding, LLC;

4.    Burlingame Capital Partners II, L.P. (which is the sole member of Electrochem Funding, LLC); and

5.    Burlingame Capital, LLC (which is the general partner of Burlingame Capital Partners II, L.P.).

The undersigned is unaware of any other related case arising out of the Final Order which is pending on appeal; Case Nos. C-06-05401 WHA and C-06-05402 SC, which are the appeal and cross appeal from the Final Order, have been consolidated in this appeal.

Dated:  April 2,2007

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP


By:  _____/s/ *William W. Huckins*_____
WILLIAM W. HUCKINS
Attorneys for Appellees and Cross-Appellants
Burlingame Capital Partners II, L.P. and
Electrochem Funding, LLC

-1-
APPELLEES AND CROSS-APPELLANTS' BRIEF ON APPEAL AND CROSS-APPEAL

704126.05/SF