IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QMECT, INC., | No. C 06-05401 WHA |
|     Appellant, | Consolidated with: |
| v. | No. C 06-05402 WHA |
| BURLINGAME CAPITAL PARTNERS II, L.P., and ELECTROCHEM FUNDING, LLC, | **ORDER AFFIRMING DECISION OF BANKRUPTCY COURT ON APPEAL AND AFFIRMING DECISION OF BANKRUPTCY COURT ON CROSS-APPEAL** |
|     Appellees. | |
| BURLINGAME CAPITAL PARTNERS II, L.P., and ELECTROCHEM FUNDING, LLC, | |
|     Cross-Appellants, | |
| v. | |
| QMECT, INC., | |
|     Cross-Appellee. | |

**INTRODUCTION**

In this bankruptcy appeal and cross-appeal, the trustee of debtor Qmect, Inc.'s Chapter VII bankruptcy estate attempts to set aside decisions of the bankruptcy court. Appellant bankruptcy trustee John T. Kendall wishes to reverse the bankruptcy court's final order and have this action remanded to the bankruptcy court for a valuation determination regarding the post-petition cash assets of the estate. The bankruptcy court did not err in holding that Qmect's post-petition accounts receivable were proceeds of collateral. Appellees and cross-appellants

Burlingame Capital Partners II, L.P., and Electrochemical Funding, LLC, wish to lift the automatic stay on secured creditors' rights to foreclose on the estate's adequate protection funds and blanket lien that were granted to secured creditors as part of the cash collateral orders. The bankruptcy court correctly held that secured creditors would have to demonstrate that their collateral had diminished in value before foreclosing on the blanket lien and receiving the adequate protection funds. Accordingly, the decision of the bankruptcy court on appeal is **AFFIRMED**, and the decision of the bankruptcy court on cross-appeal is **AFFIRMED**.

## STATEMENT

Appellant and cross-appellee John T. Kendall, bankruptcy trustee, brings this appeal on behalf of the Chapter 7 bankruptcy estate of debtor Qmect, Inc. Debtor was in the business of electroplating and anodizing electrical connectors and technical parts and equipment for metal fabricators and equipment manufacturers in industries such as medical devices and biotechnology instrumentation. It is currently operated by Burlingame or a company related thereto through foreclosure proceedings.

Qmect filed a voluntary petition under Chapter 11 of the Bankruptcy Code on February 27, 2004 (ER 91). At that time, the company had $34,291 in a deposit account, net accounts receivable of $742,839, and inventory of $55,016, for a total of $832,146 (Trustee's ER Exh. 3 at 2).

As of the petition, Qmect had the following four outstanding loans payable to Electrochem Funding: (1) a variable rate installment note, with outstanding principal of $187,500 and prepetition interest of $1,696.31; (2) a note secured by deed of trust ("DOT note"), with outstanding principal of $537,816.96 and prepetition interest of $5,052.51; (3) amended and restated note secured by deed of trust ("additional DOT note"), with outstanding principal of $894,737.22 and prepetition interest of $8,948.32; and (4) master revolving note with outstanding principal of $900,000 and prepetition interest of $7,850.60 (ER 36–37). The variable rate installment note and the revolving note were secured by senior priority liens all of Qmect's property except for certain leased equipment if the bankruptcy court found that they were "true leases," prepetition deposit accounts, and grid flooring and other fixtures in which

2

Electrochem's lien was junior to that of another creditor (ER 37). The DOT note and the additional DOT note were secured by senior priority liens on debtor's real property and fixtures at the company's facility, and all rents, issues, and profits generated therefrom (*ibid.*).

As of the petition, Qmect also had an outstanding loan payable to Burlingame. The principal was $2,000,000 with prepetition interest of $1,043,635.01 and prepetition collection costs of $357,998,59. Qmect owed $3,401,633.60 in total on the loan from Burlingame as of the petition, secured by a junior priority lien on all collateral that secured the loans from Electrochem, and a first priority lien on all of Qmect's remaining property, except for prepetition deposit accounts (*ibid.*). Appellees and cross-appellants are collectively referred to as secured lenders.

The estate filed two emergency motions on March 1, 2004 — a motion to obtain a post-petition loan and a motion to use cash collateral (ER 91). The motion to obtain a post-petition loan was granted, and the estate obtained a loan of approximately $150,000 from an individual named Brian Fitzpatrick. The bankruptcy court later found that those funds went to pay Qmect's prepetition obligations (ER 91–92).

The motion to use cash collateral was also granted (*ibid.*). Burlingame and Electrochem were granted replacement liens as adequate protections of their interests. The order for the replacement lien was as follows (ER 2–3):

> (a) As and for adequate protection of Burlingame's interest in the Debtor's assets, each of BCP and [Electrochem] Funding is hereby granted a replacement lien (the "Adequate Protection Liens") on and in the types of assets identified in the prepetition loan documents executed by the Debtor in favor of BCP or [Electrochem] Funding or their predecessors in interest (the "Adequate Protection Collateral") . . . . The Adequate Protection Liens shall be fully perfected, first priority liens as to parties other than Burlingame without the necessity of further action by or on behalf of Burlingame; shall have the same priority as existed prior to the commencement of the Debtor's chapter 11 case; and shall attach to all Adequate Protection Collateral whether now owned or hereafter acquired.
>
> (b) The Adequate Protection Collateral shall also include of the Debtor's right, title and interest in cash and deposit and investment accounts including proceeds of borrowings made by the Debtor in this Chapter 11 case.

3

1    Other orders issued by the bankruptcy court required the estate to make payments to
2    Burlingame and Electrochem's attorneys into a trust account as further adequate protection (ER
3    8–9, 11, 26, 29).
4         A contested evidentiary hearing was held on December 19, 2005, regarding Qmect's
5    continued use of cash collateral.  The bankruptcy court issued a decision that found that secured
6    lenders between them held a blanket lien on all of Qmect's assets (ER 17–19).  It also found
7    that the value of the business had decreased by over one million dollars since debtor since
8    debtor had filed for bankruptcy.
9         Secured lenders filed a motion for relief from the automatic stay to foreclose on the
10   security interests.  Qmect conceded that the automatic stay could be lifted to allow foreclosure
11   on secured lenders' collateral in existence at the time the bankruptcy petition was filed, such as
12   Qmect's real property, fixed assets, and inventory (ER 48–49).  The estate objected to the
13   petition to foreclose on its cash assets generated after the petition date.  On March 24, 2006, the
14   bankruptcy court issued an order granting the secured lenders relief from the automatic stay to
15   foreclose on their security interests in existence at the time of the petition.  They were denied
16   relief to foreclose on the assets generated post-petition (*ibid.*).  Burlingame obtained a receiver
17   over the cash collateral assets.
18        An additional hearing regarding relief from the automatic stay to foreclose on the
19   remaining assets was scheduled for May 24, 2006.  The bankruptcy court issued a memorandum
20   on issues raised in parties' trial briefs, in which it stated that it was inclined to agree that the
21   replacement liens extended on debtor's post-petition assets were blanket liens, and as such, the
22   remaining assets were proceeds of collateral regardless of whether the value of post-petition
23   collateral increased after the petition date (ER 54–55).  The estate argued that because it had
24   obtained a post-petition loan, not all of the assets acquired post-petition were proceeds of
25   secured lenders' collateral.  As such, the secured lenders would only be entitled to the portion of
26   Qmect's post-petition assets that could be traced to prepetition collateral (ER 74–76).
27        A first memorandum of decision by the bankruptcy court held that secured creditors
28   could claim proceeds of post-petition accounts receivable if they could properly trace the funds

4

using the lowest intermediate balance methodology (ER 87–91). The secured lenders filed a memorandum regarding the tracing of funds to pre-petition collateral along with declarations and supporting documentation. The estate did not dispute this evidence.

A second memorandum of decision, issued on June 27, 2006, held that Qmect used the proceeds from the post-petition loan to pay pre-petition obligations. The estate had the burden to show that the loan proceeds were used to produce post-petition assets, but failed to carry the burden (ER 103). The bankruptcy court then concluded that all remaining assets and adequate protection funds were proceeds from the secured lenders' pre-petition collateral and that the security interests could increase in value during the bankruptcy. The secured lenders were granted relief from the automatic stay to foreclose on the post-petition assets (*ibid*.). A final order to this effect was entered on July 14, 2006.

The estate moved the bankruptcy court for a stay of the final order pending appeal. In an order dated August 3, 2006, the bankruptcy court determined that the final order was immediately enforceable except for secured lenders' rights to foreclose on the adequate protection funds, totaling $345,885.31, and required that the secured lenders deposit $392,902 with the adequate protection funds if Qmect's real property was foreclosed upon. That amount constitutes the disputed cash in this appeal.

Both parties filed notices of appeal from the bankruptcy court's decisions on September 1, 2006. The bankruptcy case was converted from a Chapter 11 proceeding to a Chapter 7 proceeding by an order dated October 6, 2006. Appellant John T. Kendall was appointed as trustee. At some time thereafter, parties submitted a compromise for approval by the bankruptcy court. Briefing in this appeal was delayed pending its resolution. The bankruptcy court denied approval of the compromise on February 13, 2007.

**ANALYSIS**

The bankruptcy court's findings of fact are reviewed under a clearly erroneous standard, while conclusions of law are reviewed de novo. *In re Jan Weilert RV, Inc.*, 315 F.3d 1192, 1196 (9th Cir. 2003). This means that the bankruptcy court's findings of fact must be accepted

5

unless this Court is "left with a definite and firm conviction that a mistake has been committed." *Ibid*.

### 1.   ISSUES ON APPEAL.

The following issues are presented on appeal: (1) whether the bankruptcy court abused its discretion in entering the final order granting relief from the automatic stay so the secured lenders could foreclose on their collateral; (2) whether the bankruptcy court's findings that Qmect's post-petition assets were generated from the use of the secured lenders' collateral were clearly erroneous; (3) whether the bankruptcy court erred in holding that secured lenders' liens extended to the disputed cash and proceeds of their collateral; and (4) whether the bankruptcy court erred in concluding that secured lenders were entitled to foreclose on the proceeds of collateral that accumulated during the failed reorganization attempt.

### A.   Relationship Between Post-Petition Assets and Collateral.

Decisions to grant relief from an automatic stay are reviewed for abuse of discretion. *In re Cybernetic Servs.*, 252 F.3d 1039, 1045 (9th Cir. 2001). Section 552(b) of the Bankruptcy Code governs the relationship between security interests and post-petition assets. It states:

> [I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds . . . of such property, then such security interest extends to such proceeds . . . acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, order otherwise.

11 U.S.C. 552(b)(1). State law governs whether or not a particular item of collateral constitutes proceeds of the lien. *Butner v. United States*, 440 U.S. 48, 57 (1979). The Ninth Circuit adopts a broad definition of the term "proceeds." *Fifteenth RMA Partners, L.P. v. Pacific/West Communs. Group, Inc. (In re Pacific/West Communs. Group Inc.)*, 301 F.3d 1150, 1153 (9th Cir. 2002).

Under California law, "the attachment of a security interest in collateral gives the secured party the rights to the proceeds provided by Section 9315 and is also a security interest in a supporting obligation for the collateral." Cal. Comm. Code § 9203(f). Proceeds are

6

defined as "(a) whatever is acquired upon the sale, lease, license, exchange or other disposition of collateral, (b) whatever is collected on, or distributed on account of, collateral; (c) rights arising out of collateral." Cal. Comm. Code § 9102(64). Additionally, proceeds to which a security interest attaches are included in the definition of collateral. Cal. Comm. Code § 9102(12). Furthermore, "a security interest attaches to any *identifiable* proceeds of collateral." Cal. Comm. Code § 9315(a)(2) (emphasis added).

Appellant first contends that the bankruptcy court erred in determining that all of the post-petition assets derived from the secured lenders' collateral under the blanket lien. Appellants do not dispute that the secured lenders held a security interest in nearly all of Qmect's assets. They instead argue that the proceeds from the continued post-petition operation of Qmect were not derived from those assets. Essentially, they argue, something should cut off the secured lenders' right to proceeds from collateral since the cash collateral eventually appreciated from $742,837 to $1,570,000.

In determining that all the post-petition assets were proceeds of collateral, the bankruptcy court adopted the approach used in *In re Skagit Pacific Corp.*, 316 B.R. 330 (9th Cir. B.A.P. 2004). The panel in *Skagit Pacific* first noted that post-petition accounts receivable are not automatically proceeds. Revenue that was generated solely from services rendered was not proceeds of a secured creditor's pre-petition security interest in accounts receivable. *Id*. at 336. A secured creditor could, however, claim proceeds from post-petition accounts receivable if it could trace the proceeds to pre-petition collateral. *Id*. at 337. If the secured creditor's funds were commingled with funds from another source, then the secured creditor would have to present detailed evidence tracing the funds to the pre-petition collateral. In *Skagit Pacific*, the panel found that the secured creditor had failed to meet its burden on the tracing issue. *Id*. at 338. The panel endorsed using the lowest intermediate balance rule, which assumes that the proceeds are the last funds withdrawn from a commingled account. If the funds are withdrawn and spent, the security interest disappears, so it is calculated from the lowest balance in the account during the period in question. *Id*. at 338–340.

The bankruptcy court initially determined that the secured lenders were required to trace the funds to their pre-petition security interest (AR 88–89). It also determined that any other funds in the estate's accounts were spent to satisfy pre-petition debts, not to generate post-petition accounts receivable. Thus, the post-petition accounts receivable were proceeds of secured lenders' collateral. The bankruptcy court's factual findings that all post-petition assets were generated from secured lenders' collateral are not clearly erroneous. The only other source of post-petition funding the estate had was the loan from an individual, and there was ample evidence that those funds went to pay pre-petition debts.

### B.     Increase in Value of Collateral.

The bankruptcy court also found that secured lenders' pre-petition collateral could increase in value and the increase could inure to their benefit. In *In re 1441 Veteran Street*, 144, F.3d 1288, 1291 (9th Cir. 1998), the Ninth Circuit held that a secured creditor's security interest could attach to rents from the property produced post-petition, even though those rents represented an increase in the value of the collateral.

Qmect contends that this situation is distinguishable from *1441 Veteran Street* because it involved rents generated from a property which were directly traceable to the collateral itself. The rents in *1441 Veteran Street* were not used to generate further funds. Appellant urges that this case is more like *In re Skagit Pacific*, in which the panel noted that Section 552(a) cuts off security interests in property acquired after the petition. 316 B.R. at 335. This decision is distinguishable from the present facts because there was no blanket lien; the lender in *Skagit Pacific* only had a security interest in certain trucks and inventory of the debtor. The facts here are more like *1441 Veteran Street*. There, the secured lender held an interest in an entire property, here, Electrochem and Burlingame held an interest in substantially all of Qmect's assets. Furthermore, 11 U.S.C. 522(b)(1) and (2) provide for parallel treatment of rents and proceeds from collateral, so the trustee's attempt to distinguish rents from proceeds fails. The Ninth Circuit held further that under Section 552(b) "secured creditors shall enjoy the same rights to postpetition rents and proceeds that they would have under state law." *In re 1441 Veteran Street*, 344 F.3d at 1290–91.

8

Moreover, here the bankruptcy court found that there were, in effect, no sources to which the post-petition accounts receivable could be traced *other than* the secured lenders' collateral. Nothing other than secured lenders' collateral could have generated revenue, so all proceeds, even the increase in value, were proceeds of secured lenders' collateral.

Appellants also argue that the secured lenders' interpretation of Section 552 is inconsistent with other provisions, specifically Section 547(c)(5), which states that creditors with security interests in a floating mass like inventory or accounts receivable are subject to preference attack to the extent they improve their position. This section is not implicated in the issues presented on appeal here. Moreover, the secured lenders did not improve their positions — before and after the petition they held the same blanket lien. Accordingly the bankruptcy court correctly found that the secured lenders had a security interest in the proceeds of the collateral. Based on this finding, the bankruptcy court gave the secured lenders relief from the automatic stay to foreclose on their liens. This finding also was not in error. The bankruptcy court's decision on appeal is **AFFIRMED**.

### 2. ISSUES ON CROSS-APPEAL.

The following issues are presented on cross-appeal: (1) whether the bankruptcy court should have allowed secured lenders to enforce the replacement liens granted for Qmect's use of cash collateral without first requiring them to present evidence establishing a diminution in value of their collateral; and (2) whether the bankruptcy court should have allowed the secured lenders to obtain the adequate protection funds without first requiring secured lenders to present evidence that established a diminution in value of collateral or tracing the adequate protection funds to proceeds of collateral.

#### A. Adequate Protection and Cash Collateral Orders.

Secured lenders contend that the replacement liens granted to them should have enforceable absent any other action by them or by the bankruptcy court. They should not have been required to prove diminution in the value of their collateral before collecting on the liens, or so the argument goes. This argument was not well-developed in the record, and the secured lenders do a very poor job of pointing out where this decision was made. An order issued from

9

the bankruptcy court on March 24, 2006, granting the secured lenders relief from the automatic stay and allowing them to foreclose on substantially all of Qmect's pre-petition assets and all inventory regardless of when generated. The automatic stay still applied, however, to assets acquired or generated post-petition, including cash, deposit accounts, security deposits, and the adequate protection funds (AR 49).

Under 11 U.S.C. 363(e), "on request of an entity that has an interest in property used, sold, or leased . . . by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such an interest." Where adequate protection is requested or required:

> such adequate protection may be provided by– (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that . . . use, sale, or lease under section 363 of this title . . . results in a decrease in the value of such entity's interest in such property; (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. 361.

Pursuant to the cash collateral orders, the secured lenders were granted a replacement lien on all of the secured lenders' pre-petition collateral, as well as in Qmect's cash and deposit accounts. The secured lenders argue that the cash collateral orders granted fully perfected, first-priority replacement liens to the secured lenders, so secured lenders are arguing that by requiring them to show diminution in the value of the collateral, the bankruptcy court effectively rewrote the cash collateral orders.

First, they point out that the cash collateral orders were final and were subject to immediate appeal on their entry by the bankruptcy court. Because of the possibility of irreparable harm to the creditor if cash collateral is used, "an order granting a debtor use over funds alleged to be cash collateral requires immediate appellate review." *Watson Pacific Ventures v. Valley Fed. Sav. & Loan*, 2 F.3d 967, 969 (9th Cir. 1993). The estate did not appeal the cash collateral orders, so they then became final. This much is clear. Next, secured lenders

10

1 contend that the replacement liens and cash collateral orders *themselves* dictated that secured
2 lenders needed to pursue no further action to collect the cash collateral and foreclose on the
3 replacement liens.

### B. Diminution in Value of Collateral.

Adequate protection is made available to protect creditors from the diminution of collateral during the pendency of the bankruptcy petition; not to compensate creditors for delay in being able to foreclose on collateral. *See In re Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 377 (1988). The principle that adequate protection under 11 U.S.C. 363 is intended to compensate lenders for diminution of their collateral was reaffirmed by a Bankruptcy Appellate Panel of the Ninth Circuit. *In re Weinstein*, 227 B.R. 284, 296 (9th Cir. 1998). Bankruptcy courts have held that lenders are not entitled to foreclose on replacement liens absent proof that collateral has diminished in value as a result of the automatic stay or the collateral's use during the pendency of a bankruptcy petition. *In re Sun Valley Ranches, Inc.*, 38 B.R. 595, 598 (Br. Id. 1984) (Young, J.). Accordingly, the purpose of adequate protection is to protect lenders from diminution in the value of their collateral, so the bankruptcy court did not err in requiring secured lenders from proving that their collateral had diminished in value.

Secured lenders argue that the replacement liens were granted to them to ensure that they had a security interest in the collateral on which they already had liens, but also any other identified types of collateral that Qmect acquired during the bankruptcy. They further argue that this was a sign that the bankruptcy court intended to preserve secured lenders' rights in the collateral as their rights existed before the petition, including rights in the proceeds. Here, the basis for secured lenders' assertion is unclear. This argument also neglects the purpose of adequate protection as stated by the statute — to compensate lenders in the event their collateral decreases in value. Furthermore, the bankruptcy court twice noted that secured lenders would have to present valuation evidence showing that the value of their collateral had decreased before taking any action on the replacement liens.

"Adequate protection payments are intended to compensate the creditor for a decline in the value of the collateral." 3 Collier on Bankruptcy § 36103[2][a]. Secured lenders present

11

similar arguments regarding the adequate protection payments. Specifically, they argue that since the funds were paid into a trust account, that indicated that the adequate protection payments were necessarily there for the secured lenders' benefit. Also, they argued that the cash collateral orders did not condition the secured lenders' right to obtain the funds on proving diminution in the value of their collateral. As with the replacement liens, secured lenders' arguments are contrary to the purpose, as defined by statute, of adequate protection funds. In return for giving permission to use the cash collateral, the secured lenders got adequate protection payments to guard against diminution in the value of cash collateral and other assets.

The bankruptcy court also found that the adequate protection payments were not proceeds of collateral. Pursuant to the cash collateral orders, the adequate protection payments were paid into a separate account and were for a different purpose. Accordingly, the bankruptcy court did not err when deciding that secured lenders had to prove diminution in the value of their collateral before getting the adequate protection payments. The bankruptcy court's decision on cross-appeal is **AFFIRMED**.

## CONCLUSION

For all of the above-stated reasons, the bankrtupcy's courts decisions on appeal and cross-appeal are **AFFIRMED**.

**IT IS SO ORDERED.**

Dated: August 15, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE